CABLE AND WIRELESS, LIMITED, Plaintiff, *v.* YOKOHAMA SPECIE BANK, LIMITED, et al., Defendants.

Supreme Court, Trial Term, New York County, March 24, 1948.

*William J. O'Shea, Henry J. Kennedy* and *Irwin B. Crosman* for plaintiff.

*Edward Feldman* for defendants.

WALTER, J. On or about September 29, 1941, Yokohama Specie Bank, Limited, a Japanese corporation having an agency in New York, drew, at Tokyo, a bill of exchange addressed to itself in New York whereby it directed its New York agency to pay to the order of The Chairman, Cable & Wireless, Ltd., $101,386.89 on demand. The draft was sent by mail to plaintiff, a British corporation, in England and was indorsed by plaintiff's chairman, and plaintiff is the holder thereof.

On December 8, 1941, before the draft was presented for payment, the Superintendent of Banks of the State of New York took possession of the business and property of Yokohama Specie Bank, Limited, in New York for the purpose of liquidating the same, and since then has been and now is in possession thereof and engaged in such liquidation.

Plaintiff duly made proof of its claim on said draft and presented the same to the superintendent. The superintendent rejected the claim, and plaintiff brings this action to recover thereon.

Under the Banking Law of New York plaintiff is not entitled to payment out of the New York assets in the hands of the superintendent unless it proves (1) that its claim as a creditor of Yokohama Specie Bank, Limited, arises out of transactions had by it with the bank's New York agency, or (2) that its name appears as a creditor on the books of such agency (Banking Law, § 606, subd. 4; *Orvis* v. *Bell,* 294 N. Y. 844).

When the draft was issued plaintiff owned and operated international cables, telegraph lines and wireless telegraph circuits, and the draft was issued in settlement of traffic receipts on the London-Osaka wireless circuit due plaintiff from the Japanese Telegraph Administration. Under international conventions regulating international communications carriers plaintiff was entitled to demand payment in United States dollars and the practice long had been for Japan to pay plaintiff by means of drafts drawn on and paid by the New York agency of Yokohama Specie Bank, Limited. But the draft here in suit was not paid and it was not presented in New York for payment until after the superintendent had taken possession, and I cannot see in those conventions or in that past practice, or in anything else in the evidence, anything which shows that plaintiff's claim arises out of transactions had by it with the New York agency, even

under the somewhat liberal rule on that point adopted in *Singer* v. *Yokohama Specie Bank* (293 N. Y. 542).

Of course, if that case be in truth an adoption of the broad view that a clearly manifested mutual intent that the creditor be paid dollars out of the bank's New York funds is sufficient to show that such creditor's claim arises out of transactions had within the New York agency, as plaintiff here argues that it is, I undoubtedly would have to hold that plaintiff's claim so arises, for there can be no doubt that both parties in fact intended that plaintiff be paid dollars out of the bank's New York funds. But I discover nothing in the *Singer* case (*supra*), which leads me to believe that the court there intended to adopt that broad view.

The controlling question in this case thus is whether or not plaintiff's name appears as a creditor on the books of the New York agency.

Advice of the issuance of the draft was given by the Bank in Japan to the New York agency, not by a mere letter but by the much more formal way of sending such advice on a printed form on a fairly large sized sheet of paper having holes punched in one side or end of it to facilitate binding. This advice sheet bears the printed heading:

"The Yokohama Specie Bank, Limited
Tokyo Branch
Advice of drafts sold on
(Bank of Japan Kokko Account)"

Under that heading there are columns formed by vertical lines printed in red ink, at the tops of which there are the printed headings:

| Date of Issue | No. K | Payee | Bills Amounts | Rate | Yen Amount |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

| Date of Payment | Date of Advice | Transfer Date | Remarks |
|---|---|---|---|
|  |  |  |  |

On the sheet relating to the draft in suit, the initials N. Y. were written in ink after the words " sold on ", so that the heading reads, " Advice of drafts sold on N. Y.", and under the column headings there appear:

under Date of Issue: Sept. 29, 1941
under No. K: 3377
under Payee: The Chairman, Cable & Wireless, Ltd.
under Bills Amounts: $101,386.89
under Rate: 23 7/16
under Yen Amount: 432,584.06

The sheet is also stamped "Received New York, **Nov. 3,** 1941".

The sheet is bound, along with a number of other similar sheets, between heavy cardboard covers fastened together with brass brads which, although easily removable, nevertheless hold the sheets and the cardboard covers together in such a way as to give them the appearance of a book; and on the outside of one of the covers there is pasted a label upon which there is written:

"Tokio K a/c
B/P advice sheets"

Advice sheets of this sort were the regular, customary way of advising the New York agency of the issuance of drafts which that agency would be called upon to pay. They were sent for the very purpose of giving such advice. They were intended as records of what drafts drawn by the bank upon the New York agency were outstanding, and they were permanent at least in the sense and to the extent of being preserved until their function of serving as a record of such drafts as were outstanding had been performed.

Counsel for the superintendent questions whether the sheet relating to the draft in suit was physically in the binder prior to the time the superintendent took possession. There is no evidence, however, that it was put in the binder after he took possession, and for such materiality as the fact may have I think the evidence preponderates in favor of the view that that sheet was put in the binder when received and that it remained there.

Proof that the binder was found by the superintendent when he took possession and that he regarded it as a book of the agency is found in the fact, among other things, that the label on its front cover to which I have referred above was pasted on the cover by one of his employees after he took possession.

That binder is a book of the New York agency. Plaintiff's name appears thereon as payee of a draft drawn by the bank upon itself (for obviously there never was any thought of making the draft payable to plaintiff's chairman individually, and plaintiff is as clearly the payee as if the word "Chairman" had not been written in the draft). If, therefore, the payee of a draft drawn by a bank upon itself is a creditor of the drawer (a point

I will later discuss), then it is to my mind too clear for dispute that plaintiff's name appears as a creditor on the books of the New York agency.

Nevertheless, without directly denying that the binder is a book of the New York agency, or that plaintiff's name appears thereon, or that the payee of a draft drawn by a bank upon itself is a creditor of the drawer (at least until he parts with ownership of the draft), counsel for the superintendent earnestly and persistently contends that it is clear that plaintiff's name does not appear as a creditor upon the books of the New York agency.

In support of that contention he introduced a vast amount of evidence with respect to the details of the agency's system of bookkeeping and with respect to the practice of banks generally in recording drafts drawn upon them.

That evidence boils down to three wholly undisputed facts: (1) That the draft in suit never was made the subject of a " transfer voucher " (which counsel for the defendant insists is a journal and book of original entry, but which in reality is a mere authorization to a bookkeeper to list a draft mentioned on an advice sheet upon a register of bills payable and make debit and credit entries in interoffice accounts of the agency with the home office and other agencies) and thus never was entered in any book in such a way as to become reflected in the general ledger of the agency. (2) If the draft in suit had been made the subject of a " transfer voucher " and so had been entered in such a way as to be reflected in the general ledger of the agency, it would, under the bookkeeping practice of the agency, have been entered, not as a liability to the payee or holder of the draft but as a liability of or to (I am not clear which) the office or agency which drew the draft. (3) In making his examinations of the agency before taking possession, in ascertaining its assets and liabilities after taking possession, in preparing the statement of accounts payable which section 622 of the Banking Law requires him to file in the county clerk's office, in giving the notice required by section 620, and in setting up his own claims register for the purposes of the liquidation, the superintendent relied, and in general practice in all such liquidations, always relies, upon the general ledger and the accounts reflected in it, and took and takes no notice of advice sheets such as the one upon which plaintiff's name and the draft in suit appear.

I was, to put it mildly, amazed at that statement (confession I think it should be called) of the superintendent's practice of thus deliberately ignoring and passing by such an obvious source of information as to the existence of a liability and the identity

of the creditor as these advice sheets appear to me to be; and in order to set my mind at rest on the question whether I might be mistaken in regarding the binder of these sheets as a book of the agency, I inquired of the special deputy superintendent who was called as a witness, why that practice was followed, and his answer was, not that the binder of those sheets is not a book of the agency, but that in his opinion a draft drawn by the bank upon the agency is not a liability unless or until the draft is presented to and accepted by the agency.

If that view of the law be correct, then not only does plaintiff's name not appear as a creditor upon the books of the agency, but plaintiff is not a creditor at all. The really important question in the case thus appears to be whether or not that view of the law is correct.

Before discussing that question, however, it seems important to observe that while the superintendent's counsel in this case does not openly or avowedly take the position that that view is correct, his arguments with respect to the significance of the agency's bookkeeping practice and the fact as to how this draft would have been entered on its books other than the advice sheets if it had been so entered, tacitly involve the assumption, seemingly unrecognized by him, that the legal view expressed by the special deputy superintendent witness is correct at least to the extent that some act by the agency, in addition to the drawing of the draft, is essential to the existence of a liability. That is apparent, for example, in counsel's insistence that for a person's name to appear as a creditor upon the books of the agency it is essential that the agency, by some act of its own, shall have listed, set up, constituted, set forth, or recognized such person as a creditor upon some book in which the agency itself purports to set forth *its* liabilities.

That is apparent, also, in the citation of *Equitable Trust Co.* v. *First Nat. Bank* (275 U. S. 359) as having a bearing upon the present case. That case involved, not a draft drawn by a bank upon itself, but a draft drawn by one person upon another, and in treating the case as nevertheless pertinent to the case at bar counsel discloses his failure to realize the enormous differences between the two situations and his tacit though unadmitted assumption that a draft drawn by a bank upon itself is no more of a liability of the drawer than a draft drawn by one person upon another is a liability of the drawee prior to acceptance. It is to that to my mind wholly unwarranted assumption that all the fallacies of the superintendent and his counsel ultimately are traceable; and those fallacies seem to me particularly gross

and conspicuous in that part of counsel's argument wherein he insists that, even if the agency had entered the draft in suit in its books in such a way as to cause it to be reflected in its general ledger, it would have appeared in those books as a liability to drawer rather than as a liability to the holder of the draft. How under any theory of law or any system of book-keeping this draft could be made to appear " as a liability owing to the drawer, and not as a liability to the holder of the draft " is something I am utterly unable to comprehend.

That a draft drawn by one person upon himself or itself is in effect a promissory note or an accepted bill, accepted by the very act of issuing it, and that presentment and acceptance are not necessary to make the draft a liability of the drawer to the payee or holder, has· been decided so many times and has been so widely recognized, both before and since the enactment of the Negotiable Instruments Law, that I would not have thought that any one could or would deny or question it (*Fairchild* v. *Ogdensburg, Clayton & Rome R. R. Co.*, 15 N. Y. 337; *Pavenstedt* v. *New York Life Ins. Co.*, 203 N. Y. 91, 95, 96; *Shaw* v. *Stone*, 1 Cush. [Mass.] 228, 256; *First Nat. Bank & Trust Co. of Lexington* v. *First Nat. Bank*, 260 Ky. 581, 584, 585; *Wataugh County Bank* v. *McQueen*, 130 Tenn. 382, 385; *Walker* v. *Sellers*, 201 Ala. 189; *First Nat. Bank of Huttig* v. *Rhode Island Ins. Co.*, 184 Ark. 812, 815–816; *Clemens* v. *Stanton Co.*, 61 Wash. 419; *First Nat. Bank of Artesia* v. *Home Ins. Co.*, 16 N. M. 66, 70; *Drinkall* v. *Movius State Bank*, 11 N. D. 10; *Causey* v. *Eiland*, 175 Ark. 929, Note, 56 A. L. R. 532; *Kramer* v. *Mid-City Trust & Savings Bank*, 225 Ill. App. 575, 578, 579; *Woldert Co.* v. *Citizens' Bank*, 234 S. W. 124 [Tex.]; *Furness, Withy & Co.* v. *Rothe*, 286 F. 870, 873; *Pennsylvania R. Co.* v. *Brown*, 111 F. 2d 983; 8 Am. Jur., Bills and Notes, § 871, Negotiable Instruments Law, § 214).

In *Kerr S. S. Co.* v. *Chartered Bank of India, Australia & China* (292 N. Y. 253) there is an express holding that the purchaser of drafts drawn by defendant in New York upon its agency in Manila could not " rescind " and get back the price paid therefor when the outbreak of war made delivery and presentation impossible; and it seems to me that that is, at least by implication, a holding that defendant as drawer of the drafts was liable thereon, or, in other words, that the holder thereof was a creditor of the drawer, even though presentation to the agency in Manila had not been made and was impossible and the agency never took any action with reference to the drafts; for unless the transaction gave the purchaser that liability of

the drawer and that status as creditor, he got absolutely nothing for his money and the refusal to let him get his money back was gross injustice.

In the opinion in that case, however, Chief Judge LEHMAN referred to section 214 of the Negotiable Instruments Law and then interjected (p. 261): " The question whether that section applies where a bank, engaged in the business of selling foreign exchange, sells a bill of exchange drawn upon its branch in a foreign country is important and is·not free from doubt. We do not decide that question here nor do we decide whether a ' purchaser ' of such a bill who is not the payee is a ' holder ' within the meaning of the statute, who may exercise such an option. We assume for the purposes of this appeal that he may treat the bill as a promissory note."

Counsel for the superintendent seizes upon that statement as at least a possible indication that the draft here in suit may be be regarded as one drawn by one person upon another — i.e., that the Japanese Bank and its New York agency possibly may be regarded as separate entities; and by reason of that fact I have carefully considered all the cases cited by counsel for the superintendent upon the general question when a bank and its branches may be regarded as separate entities, in order to discover whether or not there is some case somewhere which lends countenance to the view of the law which was expressed by the special deputy superintendent who testified upon the trial and which is the actual although unavowed and unadmitted, and apparently unrecognized, premise of the argument of the superintendent's counsel. I discover no such case.

American banks and their foreign agencies have been held so far " separate business entities " that the American bank would not be required to produce in New York a transcript of the account of a depositor in one of its foreign branches (*Matter of Harris*, 27 F. Supp. 480) or answer questions as to the status of such an account (*Clinton Trust Co.* v. *Compania Azucarera Cen. Mabay S. A.*, 172 Misc. 148, aff. 258 App. Div. 780; *Bluebird Undergarment Corp.* v. *Gomez*, 139 Misc. 742).

Branches of a New York bank which required its depositors to draw their checks on the particular branch in which they had their accounts have been held so far separate and distinct that a branch in which a check on another branch has been deposited and credited to the depositor may charge the amount thereof back to the depositor's account upon learning that the check overdrew the drawer's account in the branch upon which it was drawn and that the drawer had died before the check was

deposited (*Chrzanowska* v. *Corn Exchange Bank,* 173 App. Div. 285, affd. 225 N. Y. 728); but in a later case involving the same bank it was held that changing a check by changing the name of the branch upon which it was drawn was not a material alteration, and the court specifically stated that the bank was a single corporation, no matter how many branches it maintained (*Matter of Goebel,* 295 N. Y. 73, 80).

A branch of a State Bank of Tennessee was held so far separate from the bank that when it received notice of dishonor of a bill of exchange it was entitled to another day in which to give notice of dishonor to its own indorsers (*McNeil* v. *Wyatt,* 3 Humph. [Tenn.] 125); but in the same State it also is held that such bank and its branches are so far the same that a bill payable to the president and directors of the branch is admissible in support of an action by and in the name of the bank itself (*Bank of Tennessee* v. *Burke,* 1 Cold. [Tenn.] 623).

Branches of a Maryland bank have been held so far separate and distinct that when a check drawn upon one branch was cashed by another without notice of any infirmity and the drawer stopped payment before the check reached the branch upon which it was drawn, an action could be maintained against the drawer to recover the amount thereof (*Dean* v. *Eastern Shore Trust Co.,* 159 Md. 213).

A like holding has been made with respect to an English bank having branches in different towns in England (*Woodland* v. *Fear,* 7 El. & Bl. 519, 119 Eng. Rep. 1339).

In considering who are entitled to securities deposited in New York by foreign insurance companies as a prerequisite to the right of such companies to do business in New York, our Court of Appeals twice has said that in the legislation with respect to such securities the Legislature had evinced an intention to treat the domestic agency of such companies largely as a complete and separate organization (*Matter of People* [*Norske Lloyd Ins. Co.*], 242 N. Y. 148, 158, 159; 249 N. Y. 139, 148, 149), but no holding to that effect is discernible; and *Matter of People* (*City Equitable Fire Ins. Co.*) (238 N. Y. 147) seems definitely opposed to such a holding.

*Matter of People* (*Russian Reinsurance Co.*) (255 N. Y. 415) and *Moscow Fire Ins. Co. v. Bank of New York* (280 N. Y. 286) likewise seem definitely opposed to such a holding because of their determination that after liquidation of local assets has been completed any surplus must be made available to creditors of the company abroad.

*Dougherty* v. *Equitable Life Assur. Soc.* (266 N. Y. 71) and *People* v. *Granite State Provident Assn.* (161 N. Y. 492) do not seem to me even to touch the question.

One who had a deposit with the Berlin branch of a German bank which also had a London branch was held not to be entitled to sue in England to recover the deposit without having first either demanded payment of the Berlin branch or requested that his balance be remitted to London (*Clare & Co.* v. *Dresdner Bank,* [1915] 2 K. B. 576). But one who opened an account with a Russian branch of an American bank was held entitled to sue the bank here and recover his deposit from it when the Russian branch had been closed and all assets of the bank in Russia had been confiscated (*Sokoloff* v. *National City Bank of N. Y.,* 130 Misc. 66, affd. 223 App. Div. 754, affd. 250 N. Y. 69).

Where a bill of exchange has been successively indorsed to separate branches of a bank, each branch is deemed so far an independent indorser as to be entitled to notice of dishonor (*Clode* v. *Bayley,* 12 Mees. & Wels. 51, 152 Eng. Rep. 1107).

The credit balance which a resident of Nova Scotia had at the time of his death in the New Brunswick branch of the Bank of British North America (head office London) was held to be property situate in New Brunswick so as to be subject to the New Brunswick succession duty (*Rex* v. *Lovitt,* [1912] A. C. 212). In that case it was said (pp. 219–220):

" It is true that the money was to be ' accounted for by the Bank of British North America,' but when the circumstances are considered it is seen that those words mean only that the bank is to account for the money as being money payable by them or their agents at St. John. Thus, if the manager of the St. John's branch refused payment, or if the branch itself were closed, the bank in London would, of course, be liable as a principal, but that fact does not affect the locality of the debt as originally fixed by the parties.

" Although branch banks are agencies of one principal firm, it is well settled that for certain special purposes of banking business they may be regarded as distinct trading bodies." And after citing *Woodland* v. *Fear* and *Clode* v. *Bayley* (*supra*) —" In each of these cases the Courts, having regard to the necessary course of business between the parties, held that the bank had in some measure localized its obligation to its customer or creditor, so as to confine it, primarily at all events, to a particular branch."

*Martin* v. *Nadel* ([1906] 2 K. B. 26), *Swiss Bank Corp.* v. *Boehmische Industrial Bank* ([1923] 1 K. B. 673) and *Richardson* v. *Richardson* ([1927] P. 228) all deal with garnishee process, and I am unable to perceive that they hold anything with respect to the status of a bank and its branches as one or separate.

*Bank of Old Dominion* v. *McVeigh* (20 Gratt. [Va.] 457) turned upon the validity of a payment in Confederate money, and not upon whether payment at a branch was payment to the bank.

*McVeigh* v. *Bank of Old Dominion* (26 Gratt. [Va.] 785) involved the sufficiency of a notice of dishonor to charge an indorser and not any question as to the oneness or separateness of a bank and its branches.

Where, as provisional payment of clearance balances due a collecting bank for items sent to the Bennettsville branch of a South Carolina bank, that bank drew checks upon its Columbia branch, and the bank failed before those checks were paid, it was held that under the Uniform Bank Collection Code the collecting bank had a preferred claim against the assets of the failed bank (*Marlboro Trust Co.* v. *Elliott*, 86 F. 2d 315). Whether or not that accords with the holding in *Matter of Bank of United States* (243 App. Div. 287), I do not deem it necessary to determine.

Those cases show that the implications of the view that a bank and its branches are one have not been carried by the courts to a dryly logical extreme; that the practical realities of the way in which the business of a bank with branches is carried on have been realized and viewed by the courts in a commendably realistic fashion. But I do not find in those cases, individually or collectively, any support for or even a suggestion of the view that a draft drawn by a bank addressed to one of its branches is anything other than a draft drawn by the drawer upon itself so as to constitute an obligation or liability of the drawer from the moment of its issuance without any presentment to or acceptance by the branch to which it is addressed.

It seems to me that the only possible view is the one I expressed in *Yokohama Specie Bank* v. *Milbert Importing Corp.* (182 Misc. 281, 284) : That in authorizing Yokohama Specie Bank to maintain an agency here, New York did not create a separate corporation; it merely allowed the Japanese corporation to do certain business here.

I think, therefore, that the explanation of the above-quoted statement of Chief Judge LEHMAN in *Kerr S. S. Co.* v. *Chartered Bank of India, Australia & China* (292 N. Y. 253) is that it is one of those instances, not infrequently met with in the opinions of able judges, in which farsighted vision and keen perception of possible combinations of circumstances which might affect the question in hand, coupled with great care in avoiding committing a court of last resort to a particular view on a question not immediately before it (or, to borrow the language in *Hawks* v. *Hamill* [288 U. S. 52, 58], great care in keeping " the radiating potencies of a decision [from going too far] beyond the actual holding") have resulted in his envisaging the specter of a doubt which in reality does not exist.

I conclude, therefore, that plaintiff became a creditor of the Yokohama Specie Bank, Limited, when the draft in suit was issued; that its name appears as such creditor upon the books of the New York agency; that it consequently is entitled to payment out of the assets of the bank in the hands of the superintendent; and that to the end of obtaining such payment it is entitled to judgment.

The question which remains is whether or not plaintiff is entitled to interest.

The general rule that upon claims being proved against a fund in the hands of a receiver, assignee in insolvency, or other liquidator, interest is not allowed after the date the receiver is appointed or the liquidation starts, applies only where the assets are not sufficient to pay all creditors in full (*People* v. *American Loan & Trust Co.*, 172 N. Y. 371; *People* v. *Merchants' Trust Co.*, 187 N. Y. 293; *Matter of People* [*Norske Lloyd Ins. Co.*], 249 N. Y. 139, 146, 147, *supra*; *Matter of People* [*First Russian Ins. Co.*], 253 N. Y. 365, 367, 368). Here it was conceded upon the trial that the fund in the hands of the superintendent is sufficient to pay all claims in full with interest, and plaintiff accordingly is entitled to interest unless there is some feature peculiar to this case which precludes its allowance (cases just cited in *Moscow Fire Ins. Co.* v. *Heckscher & Gottlieb,* 260 App. Div. 646, 649, affd. 285 N. Y. 674).

Counsel for the superintendent urges that interest is not allowable because payment of plaintiff's claim has been and is prohibited by Executive Order No. 8389 of the President of the United States (Code of Fed. Reg., Cum. Supp., tit. 3, p. 645), and he seems to think that that was held in *McCloskey* v. *Brown* (N. Y. L. J., April 20, 1946, p. 1548, col. 6, affd. 271 App. Div.

772) and *Moscow Fire Ins. Co.* v. *Heckscher & Gottlieb* (260 App. Div. 646, affd. 285 N. Y. 674, *supra*). There is no opinion or other statement in *McCloskey* v. *Brown* (*supra*) which enables me to appraise the holding there made, but I think *Moscow Fire Ins. Co.* v. *Heckscher & Gottlieb* (*supra*) is far from sustaining the superintendent's position. In that case, payment under a judgment was prevented by an injunction obtained by the United States upon a claim that it was the owner of the fund, payment of which was directed by the judgment, and interest during the time that the injunction was in force was limited to the interest actually earned by the fund during that time. In that case, therefore, payment was in fact prevented by an injunction obtained by a third person claiming in hostility to both the creditor and the debtor. Here, however, even upon the superintendent's view that the terms of the Executive Order are such as to include payment of plaintiff's claim among the transactions thereby prohibited in the absence of a license, and even disregarding plaintiff's contention that the licenses issued to the superintendent on January 14, 1942, and October 29, 1942, constituted such licenses as the Executive Order required, the fact remains that here it was not the Executive Order requirement of a license which did in fact prevent earlier payment of plaintiff's claim. Such payment was not made, not because of the existence of the Executive Order or because of the absence of a license, but because the superintendent regarded plaintiff's claim as not entitled to payment. Delay in payment here has been caused, not by judicial or executive compulsion, but by the superintendent's own act, and an act which I hold was wrongful; and I cannot see in that act any reason for refusing plaintiff's claim for interest.

Counsel for the superintendent further invokes the provision inserted in section 627 (subd. 1) of the Banking Law by chapter 40 of the Laws of 1944 (§ 8): " No creditor shall be entitled to receive nor be paid interest on any dividend or dividends by reason of delay in payment of such dividend or dividends ", which he says was enacted in order to overcome the decision in *Matter of Consolidated Ind. & Ins. Co.* (256 App. Div. 604, affd. 281 N. Y. 680) wherein it was said to be well settled that when payment of a dividend is deferred by reason of an unsuccessful contest of a claim, the creditor so delayed should be allowed interest on the dividend in order to be put on an equality with other creditors who received the dividends and had the use of the money.

The term "interest on any dividend" seems to me to refer to a situation where a claim has been allowed and a dividend declared, and then for some reason a delay ensues after allowance and after declaration before payment of the dividend is actually made. That was the situation in *People* v. *Remington & Sons* (59 Hun 307, affd. 126 N. Y. 679) which was cited in *Matter of Consolidated Ind. & Ins. Co.* (256 App. Div. 604, *supra*). It thus seems to me that we are not here concerned with any question of interest on a dividend; for what we are here concerned with is whether, for the purpose of computing the dividend thereon, plaintiff's claim shall be fixed and adjudicated at its face principal amount or at that amount plus interest to the time of allowance. If the statute here invoked were intended to apply to such a situation as this, the language chosen to express the intent was singularly inept and inappropriate.

If the time for adjudicating the amount of plaintiff's claim had arrived before the superintendent declared any dividend, it certainly could not be claimed that upon such adjudication any question of interest upon a dividend was involved; and while it is stated in the superintendent's brief (without any proof of the fact upon the trial so far as I recall) that the superintendent declared a dividend on May 2, 1946, it does not seem to me that the fact of such declaration can alter the adjudication of plaintiff's rights which would be made if there had been no such declaration. In no accurate or realistic sense can it be said that the delay here has been in the payment of a dividend. It has been in the adjudication of plaintiff's claim.

I thus think the statute invoked is inapplicable and conclude that plaintiff is entitled to interest from February 9, 1942, the date when its draft was presented for payment.

I accordingly direct the entry of judgment for plaintiff for $101,386.89, with interest thereon from February 9, 1942, and costs. The judgment should provide, however, that payment is to be made only when such license, if any, as is required by Executive Order No. 8389, has been obtained (*Bollack* v. *Societe Generale, etc., en France,* 263 App. Div. 601, 605; *Leeds* v. *Guaranty Trust Co.,* 272 App. Div. 909).

The foregoing constitutes the decision required by the Civil Practice Act, and judgment is to be entered thereon.