MITSUO TAGAWA, EITA SATO, KAICHI IKEDA, TOMI-TARO IIDA, DEPOSITOR-CREDITOR-CLAIMANTS OF THE SUMITOMO BANK OF HAWAII *v.* CLARENCE K. KARIMOTO, SUCCESSOR TRUSTEE FOR CREDITORS AND SHAREHOLDERS OF SUMITOMO BANK OF HAWAII IN DISSOLUTION, AND WILLIAM P. ROGERS, ATTORNEY GENERAL OF THE UNITED STATES AS SUCCESSOR TO THE ALIEN PROPERTY CUSTODIAN.

No. 4023.

ARGUED JULY 2, 1958.                    DECIDED AUGUST 28, 1958.

RICE, C. J., STAINBACK, J., AND CIRCUIT JUDGE WIRTZ
IN PLACE OF MARUMOTO, J., DISQUALIFIED.

2

OPINION OF THE COURT BY CIRCUIT JUDGE WIRTZ.

This is an appeal from a judgment by the circuit court, first circuit, Territory of Hawaii, entered on cross-motions for summary judgment, allowing compensatory interest on bank accounts which were owned by persons subject to the foreign funds freezing controls imposed by Executive Order No. 8389, as amended (6 Fed. Reg. 2897, June 17, 1941).

The facts are not in dispute.

This is a class action brought by plaintiffs-appellees on behalf of themselves and others who were residents of Hawaii and citizens of Japan during the period from December 7, 1941 to November 28, 1942, hereinafter sometimes referred to as the "interest period." On and before December 7, 1941, they were depositors of the Sumitomo Bank of Hawaii, hereinafter referred to as "the Bank" or "Sumitomo," a corporation organized under the laws of the Territory of Hawaii, engaged in general banking business in Honolulu. Plaintiffs-appellees sought to recover six percent interest on their accounts in the Bank while subject to the freezing controls imposed by Executive Order No. 8389, as amended, *supra,* during the interest period (Stip. Exhibit 1, Rec. Vol. I, pp. 69-87). Defendant-appellant, William P. Rogers, Attorney General of the United States, as successor to the Alien Property Custodian, is, by virtue of Vesting Order No. 1499 (8 Fed. Reg. 9244), the holder of 98.5 percent of the stock of the Bank. (By order dated February 20, 1958, William P. Rogers, the present Attorney General of the United States, was substituted as defendant-appellant in place of Herbert Brownell, Jr., former Attorney General of the United States and such on the date these proceedings were instituted).

Under the authority of section 5(b) of the Trading with the Enemy Act, 40 Stat. 411, as amended, 50 U.S.C. App. Sec. 1, et seq., hereafter referred to as "the Act," the President of the United

4

States issued, on April 10, 1940, Executive Order No. 8389 (5 Fed. Reg. 1400, April 12, 1940) prohibiting certain financial transactions, including "all payments by or to any banking institution within the United States" by a foreign national or involving property in which a foreign national has an interest, unless licensed or otherwise authorized by the Secretary of the Treasury (Stip. 3, Rec. Vol. I, pp. 69-87).

Executive Order No. 8389, as amended by Executive Order No. 8785 (6 Fed. Reg. 2897, June 17, 1941) and Executive Order No. 8832 (6 Fed. Reg. 3715, July 29, 1941), on July 26, 1941 extended the controls set forth in Executive Order No. 8389 to nationals of Japan, among others.

As citizens of Japan, plaintiffs-appellees were "foreign nationals" within Executive Order No. 8389, as amended (Stip. 50, Rec. Vol. I, pp. 69-87). Accordingly, their accounts in the Bank were blocked. In addition, the Bank was itself blocked, as 98.5 percent of its outstanding stock was owned by nationals of Japan (Stip. 1 and 4, Rec. Vol. I, pp. 69-87). However, the Secretary of the Treasury, by General License No. 66 (6 Fed. Reg. 3726, July 29, 1941); permitted the Bank to operate as a generally licensed national. He also issued General License No. 68 (6 Fed. Reg. 3726, July 29, 1941) whereby all nationals of Japan "residing only in the United States at all times on and since June 16, 1940," were licensed as generally licensed nationals (Stip. 5a and 5b, and Stip. Exhibit 1 (b), Rec. Vol. I, pp. 69-87).

On December 7, 1941, the Secretary of the Treasury issued Public Circular No. 8 (6 Fed. Reg. 6304, December 9, 1941) which revoked all special and general licenses previously issued to Japanese nationals, including the afore-mentioned General License Nos. 66 and 68 (Stip. 8, Rec. Vol. I, pp. 69-87). On the same day, agents of Foreign Funds Control of the United States Treasury Department took physical custody of all of the cash and other assets of Sumitomo together with all of its books and records. Sumitomo ceased operations (Stip. 9, Rec. Vol. I, pp. 69-87).

Thereafter a series of general licenses were issued which permitted Japanese nationals who were residents of Hawaii to carry out certain transactions. Said general licenses permitted withdrawals for living expenses and other purposes.

On January 13, 1942, the Secretary of the Treasury authorized the Governor of Hawaii to liquidate Sumitomo. Pursuant to this authorization, and the authority of section 5(b) of the Act which had been delegated to him by the Secretary of the Treasury, the Governor made an order declaring Sumitomo to have been in liquidation since December 7, 1941, appointed a receiver, and ordered said liquidation to continue until completed (Stip. 14 to 17, inclusive; Stip. Exhibits 8 to 14, inclusive, Rec. Vol. I, pp. 69-87). The receiver immediately took custody of all assets of Sumitomo (Stip. 18, Rec. Vol. I, pp. 69-87), and proceeded with its liquidation under authority of General License H-11.

On April 16, 1942, the Foreign Funds Control, Office of the Governor of Hawaii, indicated that it would be satisfactory if the receiver followed a procedure whereby all claims against Sumitomo under $100 would be paid without regard to citizenship or blocked status of the claimant, and all claims of blocked nationals of $100 or more be paid into blocked accounts in domestic banks. (Stip. 20; Exhibits 16 and 17, Rec. Vol. I, pp. 69-87). Thereafter, on October 16, 1942, the Governor of Hawaii issued General License H-15, authorizing payment of the claims of creditors including accounts of blocked depositors up to $200; and further provided for payment to a blocked national of any sum in excess of $200 on condition it was paid into a blocked account in a domestic bank. (Stip. 22; Stip. Exhibit 18, Rec. Vol. I, pp. 69-87).

Having duly published notices for the filing of claims by all creditors, the receiver on October 28, 1942 declared dividends of 100 percent on all claims filed and allowed by him (Stip. 21 and 23, Rec. Vol. I, pp. 69-87). All such claims, including the claims of plaintiffs-appellees, and other blocked nationals of Japan, were paid on and about November 28, 1942, pursuant to General License H-15 (Stip. 23, Rec. Vol. I, pp. 69-87).

On and after November 28, 1942, the receiver had sufficient money and realizable assets of Sumitomo on hand to pay all of the claims filed by depositors and other creditors, and approved by him, together with interest thereon at six percent per annum from December 7, 1941 to November 28, 1942 (Complaint, par. IV, Rec. Vol. I, pp. 1-11; Stip. 25, Rec. Vol. I, pp. 69-87).

On April 29, 1943, the Alien Property Custodian, acting pur-

suant to the Trading with the Enemy Act and executive orders issued thereunder, including Executive Order No. 9095 of March 11, 1942 (7 Fed. Reg. 1971), as amended by Executive Order No. 9193 of July 6, 1942 (7 Fed. Reg. 5205, Stip. Exhibit 19[a], Rec. Vol. I, pp. 69-87), issued Supervisory Order No. 147, by which he undertook the direction, supervision, management and control of Sumitomo. Said Supervisory Order (Stip. Exhibit 20, Rec. Vol. I, pp. 69-87) has not been revoked. (Stip. 28, Rec. Vol. I, pp. 69-87).

On the same day the Custodian requested the Secretary of the Treasury to release all assets to him. The Secretary agreed to the request and instructed the Governor to release control to the Custodian (Stip. 29, Rec. Vol. I, pp. 69-87). On May 1, 1943, the Governor revoked the order of February 28, 1942 and directed the receiver to surrender all of the assets of Sumitomo to the Custodian (Stip. 30, Rec. Vol. I, pp. 69-87). The former receiver was appointed by the Custodian to continue the liquidation.

On May 18, 1943, pursuant to Vesting Order No. 1499 (8 Fed. Reg. 9244), the Alien Property Custodian vested 1970 shares of Sumitomo's 2000 outstanding shares of stock as the property of "nationals of a designated enemy country (Japan)" (Stip. 33; Stip. Exhibit 27, Rec. Vol. I, pp. 69-87). Defendant-appellant, William P. Rogers, Attorney General of the United States, as successor to the Alien Property Custodian, is still the owner of the vested stock, representing 98.5 percent of all of the Bank's outstanding capital stock.

Upon Sumitomo's Petition for Voluntary Dissolution, the Treasurer of Hawaii issued a decree of dissolution on February 16, 1945 and appointed trustees for the creditors and stockholders of the Bank (Stip. 36, 37, 38; Stip. Exhibits 30 and 31, Rec. Vol. I, pp. 69-87). At this time, the supervisor of the Bank, as agent for the Custodian, transferred all of the Bank's assets to said trustees (Stip. 39; Stip. Exhibit 32, Rec. Vol. I, pp. 69-87).

The liquidation of Sumitomo was continued by the trustees, subject to the orders issued pursuant to Supervisory Order No. 147, permitting the Bank to engage only in such transactions as are approved by the Alien Property Custodian, his successor the Attor-

ney General, or by their duly appointed supervisors (Stip. 31, 39, 42; Stip. Exhibits 24, 25, 34 and 36; Rec. Vol. I, pp. 69-87).

On August 18, 1949, the circuit court of the first circuit, Territory of Hawaii, ordered the then trustees of Sumitomo to publish certain notices to creditors after the Treaty of Peace with Japan was ratified. Under said order and publication made pursuant thereto, the final "bar date" for certain creditors of Sumitomo to file claims with the trustees in dissolution was July 13, 1953. Commencing on July 9, 1954, after the final "bar date" and pursuant to authorization received from the then Attorney General of the United States, Brownell, the trustee, Karimoto, paid interest to the entire group of depositor-creditors at the legal rate of six percent for the interest period on all accounts at Sumitomo which were not blocked between December 7, 1941, and November 28, 1942, and on all accounts under $100 without regard to any blocked status of the account during the interest period (Stip. 47 and 48; Stip. Exhibit 38, Rec. Vol. I, pp. 69-87). In accordance with these instructions the trustee, on September 16, 1954, rejected demands for interest made on August 14 and 21, 1954, by plaintiffs-appellees, Mitsuo Tagawa, Eita Sato, Kaichi Ikeda and Tomitaro Iida, who had been owners of blocked accounts of over $100 (Stip. 50 and 51; Stip. Exhibits 39-42, inclusive, Rec. Vol. I, pp. 69-87). This action followed.

The circuit court was of the view that the liability of the Bank for the payment of interest to the depositors depended upon whether the obligation of the Bank to them was absolute and unconditional. It held that the blocked status of the depositors under the freezing control order rendered the obligation conditional on the grant of a license authorizing the release of the accounts to them. It held further, that except for General License H-8, the various general licenses relied on by the appellees did not have the effect of authorizing the unconditional release of their accounts with the Bank and, thus, did not make the Bank's obligation to them unconditional. It concluded, however, that General License H-8, which authorized the release of blocked funds for the purchase of United States savings bonds, did not have such effect (Rec. Vol. II, pp. 379-391). Accordingly, it entered judgment ordering the trustee to pay the depositors compensatory interest

for the interest period (Rec. Vol. II, pp. 392-395). This appeal is taken from that judgment (Rec. Vol. II, pp. 396-397).

It is settled law in this jurisdiction, as well as generally, that when a bank is placed in receivership, it is immediately in default of its obligations and, accordingly, when there is a sufficient surplus remaining after payment of all claims, it must pay interest to its depositors and other creditors for the period from suspension of operations until payment of principal at the legal rate provided in section 191-1, Revised Laws of Hawaii 1955. (*In re Chinese-American Bank*, 36 Haw. 571.)

. But defendants-appellants contend that this rule is inapplicable in the present case "because here it was the depositors' personal disability under the freezing order which barred payment of their deposits, unless licensed by the proper authorities." (Op. Br. p. 15.)

We are reasonably sure that defendants-appellants are not advancing the theory that the accident of birth of the depositors led to the receivership of Sumitomo. Rather it was the accident of birth of the stockholders of Sumitomo that was responsible for the receivership. An examination of the Act and the various cases cited in the brief referring to the Act clearly indicate an established plan, in the event of the outbreak of hostilities, whereby enemy-owned banks would be placed in receivership. From the effective date of Executive Order No. 8389, as amended, until the outbreak of hostilities on December 7, 1941, both the affected banks and depositors' accounts were controlled by the licensing procedure. Thereafter and until date of payment of claims by the receiver, control of the banks and accounts was effectively maintained through receivership, the receiver being authorized by license to carry out the receivership and after all claims had been considered those holding acceptable claims were licensed to receive payment.

In support of their position that the general rule of distribution is inapplicable to the present case, defendants-appellants cite among other cases, *Banque Mellie Iran* v. *Yokohama Specie Bank*, 299 N. Y. 139, 85 N. E. (2d) 906 (1949), aff. sub nom. *Lyon* v. *Singer*, 339 U. S. 841; *Singer* v. *Yokohama Specie Bank*, 299 N. Y. 113, 85 N. E. (2d) 894, aff. sub nom. *Lyon* v. *Singer, supra; Cable & Wireless Ltd.* v. *Yokohama Specie Bank*, 191 Misc.

567, 79 N. Y. S. (2d) 597 (Sup. Ct., N. Y. County, 1948) modi-
fied 278 App. Div. 752, 103 N. Y. S. (2d) 1016 (1951), aff.
304 N. Y. 574, 107 N. E. (2d) 75 (1952); as establishing the
exception to the general rule that where Treasury authorization is
required before payment (otherwise prohibited by Executive Order
No. 8389) may be made by a bank in liquidation, interest does
not accrue on the obligation.

We do not have to necessarily quarrel with the rulings of the
New York court in these cases as it clearly appears from those
cases that the claims or obligations under consideration had never
ripened into maturity. The effect of Executive Order No. 8389,
as amended, prevented the creation of any obligation between the
obligor and obligee. They were clearly conditional obligations in
that a necessary condition precedent had never been fulfilled.
Accordingly, the New York courts rendered conditional judg-
ments. It should likewise be noted that the actions in New York
were brought as a result of the denial of creditors' claims by the
receiver to reestablish those claims as "preferred" claims in the
receivership. Unlike the present case, since the claims were still in
dispute, no "surplus" had yet been determined from which interest
could be paid. It would also appear from those cases that interest
was claimed as damages rather than as an incident to a deposit as
is the case here. This view of interest as "damages" rather than as
compensation is confirmed by *Moscow Fire Ins. Co. of Moscow,
Russia* v. *Heckscher & Gottlieb*, 285 N. Y. 674, 34 N. E. (2d)
377, affirming 260 App. Div. 646, 23 N. Y. S. (2d) 424, one of
the cases relied on by the court in the *Banque Mellie Iran* case
(*supra*) to support "the proposition that interest does not accumu-
late upon an obligation to pay unless it is unconditional." In the
*Moscow Ins.* case (*supra*) the court while denying interest at the
legal rate allowed nominal interest actually earned by the use of
the impounded funds during receivership.

We do not dispute the fact that plaintiffs-appellees, as depositors
of Sumitomo since they were nationals of Japan, were subject to
the freezing controls of Executive Order No. 8389, as amended.
Accordingly, their deposits in Sumitomo were "blocked" and as
provided in said Executive Order they were unable to demand pay-
ment or transfer their assets "unless licensed or otherwise author-

ized by the Secretary of the Treasury." (Stip. 3, Rec. Vol. I, pp. 69-87.) (See *Singer* v. *Yokohama Specie Bank* [*supra*].)

However, prior to December 7, 1941 the depositors were licensed by the Secretary of the Treasury under General License No. 68 while Sumitomo itself was licensed to operate under General License No. 66. Sumitomo closed its doors for business on December 6, 1941 and never reopened them. On December 7, 1941, the Secretary of the Treasury revoked all special licenses previously issued to Japanese nationals, including General License Nos. 66 and 68. On the same day, agents of the Foreign Funds Control of the United States Treasury Department took physical custody of all the cash and other assets of Sumitomo together with all of its books and records. On January 13, 1942 pursuant to the authorization of the Secretary of the Treasury and under the authority of section 5(b) of the Act, which had been delegated to him by the Secretary of the Treasury, the Governor of Hawaii made an order declaring Sumitomo *to have been in liquidation since December 7, 1941,* appointed a receiver and ordered said liquidation to continue until completed. Thus, it will be seen that at the inception of the receivership of Sumitomo, plaintiffs-appellees' accounts were "unblocked" by virtue of General License Nos. 66 and 68.

True, appellees' accounts were again "blocked" on December 7, 1941 and remained in such status during the receivership. It is difficult to see how any of the various general licenses issued subsequent to December 7, 1941 could have in any way affected the depositors since Sumitomo was in receivership. Nothing short of compliance by the receiver with the Hawaii Bank Act 1931, as amended, (Chap. 178, Revised Laws of Hawaii 1955), especially in connection with determination and approval by the receiver of claims submitted by creditors pursuant to notice, could place the depositors in any position to expect repayment of their deposits. Consequently, their deposits were effectively frozen during the period of receivership from December 7, 1941 up to the time when the receiver was in a position to make distribution. This was in the fall of 1942 and on October 16, 1942, the Governor of Hawaii issued General License H-15 which permitted the receiver on November 28, 1942 to make a 100 percent distribution to all the creditors of Sumitomo in accordance with said license. At that time,

on November 28, 1942, the receiver had sufficient money and realizable assets of Sumitomo on hand to pay all of the claims filed by the depositors and other creditors and approved by him together with interest thereon at six percent per annum during the interest period. In other words, after collecting all of the assets of Sumitomo, the receiver had a surplus on hand which would have permitted him to pay all of the claims in full together with interest at the legal rate as provided by section 191-1, Revised Laws of Hawaii 1955.

In the *Banque Mellie Iran, Singer,* and *Cable* cases (*supra*), the transactions which gave rise to the claims of plaintiff arose after the effective date of Executive Order No. 8389, as amended, and prior to December 7, 1941. Although applications for a license were made, none were granted. These claims were thus "blocked" from their inception up to the time of receivership. In Sumitomo, the accounts in question although subject to Executive Order No. 8389 were "unblocked" almost simultaneously with the execution of the aforesaid Executive Order by General License Nos. 66 and 68. They remained "unblocked" until December 7, 1941 and the inception of the receivership.

In substance, then, we have here a simple receivership situation where the normal rules apply. The real basis for a bank's liability in receivership for legal interest in the event surplus assets exist over and above the amount necessary to pay the claims of all depositors and creditors of the bank in receivership is that the depositors and creditors are entitled to compensation (not damages) for the delay in making reparation of their claims after the bank has closed its doors. (*Greva* v. *Rainey,* 2 Cal. [2d] 338, 41 P. [2d] 328.) The rule is based upon equitable considerations and not upon the fault of either the bank, the depositors or creditors.

Where money is deposited in a bank, it constitutes a loan to the bank of the money deposited subject to the undertaking by the bank to repay the same in money to the depositor, his assigns or legal representatives, upon demand conformable to the contract of deposit in respect to time of repayment and amount. Such deposit constitutes "money lent" to the bank within the meaning of that term as employed in the Revised Laws of Hawaii 1955, section

191-1. Upon receivership, interest as an incident to such deposit accrues at the legal rate provided by the statute, until discharged by payment or merged in judgment. (*In re Chinese-American Bank, supra.*)

The Supreme Court of the United States in *Vanston Bondholders Protective Committee* v. *Green*, 329 U. S. 156, at 165, states:

"It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and debtor."

In *Sexton* v. *Dreyfus*, 219 U. S. 339, at 346, the court had this observation to make:

"There is no more reason for allowing the bankrupt estate to profit by the delay beyond the day of settlement than there is for letting the creditors do so."

And the rule is the same whether the liquidation is accomplished by the voluntary act of the debtor or by the act of creditors or by persons vested with statutory liquidation authority. (*In re F. P. Newport Corp.*, 123 F. Supp. 95 [appeal dismissed 216 F. (2d) 344, cert. den. 348 U. S. 972, reh. den. 349 U. S. 925]; *Fujikawa* v. *Sunrise Soda Works*, 158 F. [2d] 490 [1946], [cert. den. 331 U. S. 832 (1947)]; *Paramount Pictures Inc.* v. *Sparling*, 93 Cal. App. [2d] 768, 209 P. [2d] 968 [1949], [cert. den. sub nom. *McGrath* v. *Paramount Pictures*, 339 U. S. 953]; *Littleton* v. *Kincaid*, 179 F. [2d] 848 [1950], [cert. den. 340 U. S. 809].)

The basis for the Bank's liability in this jurisdiction is on the theory that the obligation of the Bank to its creditors upon receivership is "transferred to the fund" and interest is payable out of the earnings of the fund. In other words, claims against a closed bank are *in rem*. (*In re Chinese-American Bank, supra.*)

Since the claims are against the fund, it is immaterial whether the obligor could have paid or whether the obligee could have received it if the obligor could have paid it. Under the rule above expressed, because there is a liquidation, interest is payable where there is a sufficient surplus after payment of the principal.

In every bank liquidation case where the proceeding is started

involuntarily and there later appears a surplus, it could hardly be said that anyone was at fault. But still in such situations, interest is payable once there is a surplus. The reasoning is that the claim is against the fund and is an *in rem* matter and the payment of interest is made because it is equitable to do so once there is a surplus.

This court in *In re Chinese-American Bank,* (*supra*) at page 591, established the rule that "Matured claims of creditors relate to and are predicated upon the rights of a creditor as they existed at the time the treasurer went into possession of the property of the bank for the purpose of winding up its affairs." It is further stated, "The legal status of creditors of an insolvent bank as it exists at the time the treasurer goes into possession for the purpose of liquidation fixes their rights to share in the distribution of the estate of the insolvent bank." In the instant case, the deposits of plaintiffs-appellees were "matured" and accordingly unconditional as they were "unblocked" at the inception of the receivership and it is their rights as of that time that are in issue before this court.

It has been urged that the rule of collateral estoppel by judgment applies in this case and that the court's rulings in the *Fujikawa* and *Paramount Pictures* cases (*supra*) are controlling. However, it must be admitted that the effect of the "blocked" status of the depositors' accounts was not considered in the *Fujikawa* and *Paramount Pictures* cases (*supra*). While the rulings of the courts in those cases are not, therefore, controlling under the doctrine of collateral estoppel by judgment still they are helpful in supporting the conclusions hereinabove reached in the application of equality to all creditors in receivership.

As indicated above all of the licenses issued subsequent to December 7, 1941 and during the interest period are inapplicable to this situation in view of the fact that Sumitomo was in receivership, with the exceptions above indicated of General Licenses H-11 and H-15 which authorized and empowered the only person who, by law, could act, the receiver, to act. In view of this, no further discussion of these various licenses is pertinent to this decision.

The remaining question concerns itself with whether the depositors' right of action for interest was extinguished by the acceptance of the principal amount of their claims. In this connection, the

defendants-appellants rely on the rule set forth in a leading case on this subject. (*Stewart* v. *Barnes*, 153 U. S. 456 [1893].) They contend that the depositors accepted payment to them of 100 percent on the principal amount of their deposits immediately after November 28, 1942 and that having accepted this payment from a solvent estate, they are now precluded from recovering interest.

The general rule in receivership is that when there is a surplus of assets after paying all indebtedness, the right to interest is not affected by the fact that creditors have previously accepted payment of the principal of their claims. (*National Bank, etc.* v. *Mechanics National Bank*, 94 U. S. 437 [1876]; *State ex rel McConnell* v. *Park Bank & Trust Company*, 151 Tenn. 195, 268 S. W. 638 [1925].) The reason for the rule is that acceptance of principal in such situations is considered to be involuntary. We can see no distinction whether such payments of principal are made in installments or in whole as was done in this case.

. But the defendants-appellants contend that this rule is not applicable where the estate is solvent as in this case. We can not follow this reasoning as in all cases where this rule is applied, the estates were solvent in the final analysis otherwise the question would not have arisen.

It is difficult for us to comprehend how the question of insolvency of a bank in receivership can be determined at any time prior to a determination of all possible claims of the creditors against the estate at which time only would it appear whether or not there is a surplus for distribution on account of interest. (*Stein* v. *Delano*, 121 F. [2d] 975.) Further, banks are considered to be insolvent when they are unable to meet their obligations as they mature and their status is determined by the closing of their doors rather than by the theoretical state of their balance sheets. (*Smith* v. *Witherow*, 102 F. [2d] 638.)

By the use of hindsight in all of the cases dealing with banks in receivership where a surplus exists sufficient to pay the interest on the creditors' claims, these banks could well have been considered as solvent at the inception of the receivership.

The waiver of a right implies knowledge of that right or, in this case, knowledge that funds sufficient to pay interest at the legal rate was available. It could hardly be said that the depositors

at the time they received distribution of the full amount of their deposits were aware they were entitled to the interest because of a sufficiency of funds. The stipulation in the record, being stipulation 25 in volume I in pages 69-87, is merely an admission aided by hindsight that ample funds to pay interest for the entire interest period were available at that time.

Also there was a rather serious question as to whether any interest was due and payable to any of the depositors under the applicable law at that time. It was not until December 5, 1946, with the decision rendered by the Ninth Circuit Court of Appeals in the *Fujikawa* case (*supra*) that the legal right to interest by any of the depositors was determined. As a result of that decision, the receiver did pay interest to the resident citizen depositors but withheld the payment of interest to the resident alien depositors. No question of waiver was raised in connection with the resident citizen depositors. This conclusion is heightened by the petition filed on February 17, 1945 in *Green* v. *Markham,* equity number 4496, circuit court, first circuit, Territory of Hawaii, where the trustees of Sumitomo alleged their uncertainty as to whether interest was payable and that this question contemplated a judicial determination.

Furthermore, no depositors could know for certain until July 13, 1953 that there would be a surplus. This was the day that defendant-appellant trustee Karimoto reported as the final day after which all possible claims were barred (see Exhibit 58).

Defendants-appellants deemed that the claims of the depositors included principal and interest. However, the facts are otherwise as the claims in receivership, or, at least allowed by the receiver, can only be for the amount of principal due and owing. No claim for interest can possibly arise until after it has been determined that there is more than sufficient to pay the principal of the claims filed in full.

Even if the depositors had demanded interest at the time distribution was made in the fall of 1942 and the same had been refused, they could not have taken any action against either the receiver or the trustees in dissolution. The interest was not a part of the claim and before any action accrues against a receiver a claim must be denied or rejected. (Section 178-139, R. L. H. 1955;

See Braver, *Liquidation of Financial Institutions,* 1936, § 1056, p. 1220.) The receiver in the present case did not reject the respective claims of the plaintiffs-appellees and the class of depositors whom they represent. Instead, the claims were approved and allowed.

On this question of waiver, there can be no valid distinction made between the claims of the resident depositors and those of the alien depositors as the circumstances of payment are alike in all instances. The citizen depositors who accepted their full payment of principal in the fall of 1942 received their interest payments in July of 1954. Arbitrary and prejudicial treatment of one group of creditors in any receivership without any reason or logic violates the fundamental and basic rule in receivership that "equality is equity."

In the court below and in the briefs and arguments heard, defendants-appellants have admitted that it would be reasonable to allow those resident alien depositors who invested their principal distribution of November 28, 1942 in U. S. War Bonds under General License H-8 to receive interest during the interest period. However, the defendants-appellants contended and still contend that the balance of the resident alien depositors who did not so utilize their principal distribution should be denied interest. Such inconsistency is irreconcilable with equitable principles.

Although the reasoning of this decision differs from that of the decision of the circuit court below, still our conclusions are the same. In *Estate of Mary E. Foster,* 33 Haw. 666, 676, this court held: "* * * It is primary and elementary in this jurisdiction that 'the decision of the circuit judge cannot be reversed because he gave wrong reasons, provided he came to a correct conclusion.' *Calaca* v. *Caldeira,* 13 Haw. 214; *Colburn* v. *Holt,* 19 Haw. 65; *Lee Lun* v. *Henry,* 22 Haw. 165; *Consolidated Amusement Co.* v. *Hughes,* 22 Haw. 550."

Accordingly, the judgment appealed from is affirmed.

*Irwin A. Seibel,* Deputy Attorney General of the United States (*Dallas S. Townsend,* Assistant Attorney General, Director, Office Alien Property; *Louis B. Blissard,* United States Attorney for the District of Hawaii; *Charles R. Wichman,* Assistant United States Attorney, Honolulu, T. H.; *George B. Searls, Marbeth A. Miller,*

Attorneys, Department of Justice, Washington, D. C., with him on the briefs [Mr. Wichman not on reply brief]), for the Attorney General of the United States, defendants-appellants.

*Shiro Kashiwa* (*Genro Kashiwa* with him on the brief) for plaintiffs-appellees.