7 P.3d 1068

KA PAʻAKAI O KAʻAINA, an association of Ka Lahui Hawaiʻi, a Hawaiian nation, Kona Hawaiian Civic Club, a Hawaiʻi nonprofit corporation, and Protect Kohanaiki Ohana, a Hawaiʻi nonprofit corporation, Ka Lahui HawaiʻI, Kona Hawaiian Civic Club and Protect Kohanaiki Ohana, Plaintiffs–Appellants/Appellants

v.

LAND USE COMMISSION, STATE OF HAWAIʻI; Office of State Planning, State of Hawaiʻi; County of Hawaiʻi Planning Department; KaʻUpulehu Developments, Appellees/Appellees,

and

Plan To Protect, a Hawaiʻi nonprofit corporation, Appellees/Cross–Appellants/Appellants/Appellants.

Plan To Protect, Appellant/Cross–Appellants,

v.

State of Hawaiʻi, Land Use Commission, Appellees/Appellees

No. 21124.

Supreme Court of Hawaiʻi.

Sept. 11, 2000.

As Amended Jan. 18, 2001.

Michael J. Matsukawa, on the briefs for Plaintiff–Appellant/Appellant Ka Paʻakai O Ka ʻAina, an association of Ka Lahui Hawaiʻi, Kona Hawaiian Civic Club and Protect Kohanaiki Ohana.

Jon S. Itomura and Russell A. Suzuki, Deputy Attorneys General, on the briefs for Appellee/Appellee Land Use Commission.

Robert D.S. Kim and John P. Powell, kailua Kona, on the briefs, for Appellee/Cross–Appellant/ Appellant/Appellant Plan to Protect, Inc.

Frederick Giannini, Deputy Corporation Counsel, Hilo, on the briefs, for Appellee/Appellee County of Hawaiʻi.

R. Ben Tsukazaki, Hilo, Of Counsel: Menezes, Tsukazaki, Yeh & Moore, Hilo and Michael W. Gibsen and James K. Mee, Of Counsel: Ashford & Wriston, Honolulu, on

**34**

the briefs, for Petitioner–Appellee Kaupulehu Developments.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by RAMIL, J.

■ This consolidated appeal[1] arises from the Land Use Commission's (LUC) grant of a petition to reclassify approximately 1,009.086 acres of land in the ahupua'a[2] of Ka'ūpūlehu on the Big Island of Hawai'i from a State Land Use "Conservation District" to a State Land Use "Urban District." Plaintiff-appellant/appellant Ka Pa'akai O Ka 'Aina, an association of Ka Lāhui Hawai'i (Ka Lāhui), Kona Hawaiian Civic Club (KHCC), and Protect Kohanaiki Ohana (PKO) (collectively "Ka Pa'akai" or the "Coalition") and Appellee/cross-appellant/ appellant/appellant Plan to Protect (PTP) appeal from the third circuit court's September 30, 1997 judgment affirming the Land Use Commission's (LUC) June 17, 1996 findings of fact, conclusions of law, decision, and order granting Kaupulehu Developments' (KD) petition for land use boundary reclassification.

On appeal, Ka Pa'akai contends that the circuit court erred in: (1) failing to address errors that Ka Pa'akai assigned to the LUC's decision below; (2) concluding that the LUC could consider the Department of Land and Natural Resources' (DLNR) comments; (3) ruling that the LUC properly "delegated" its authority to KD and KD's landlord; (4) ruling that the LUC's findings were supported by reliable, probative, and substantial evidence; (5) concluding that the LUC's decision complied with Hawai'i Revised Statutes

(HRS) § 205–17 (1993); and (6) determining that Ka Pa'akai failed to make a convincing showing that the LUC's decision was unjust or prejudicial to Ka Pa'akai.

PTP argues that: (1) the LUC failed to discharge its obligation to ensure that legitimate customary and traditional practices of native Hawaiians be protected to the extent feasible; (2) the LUC's findings dealing with the demand for the project are clearly erroneous in light of KD's failure to establish that, without the fee title, its proposed project would not be economically viable; (3) the LUC's decision was erroneous or entailed an abuse of discretion in light of KD's failure to provide a concise statement of the means by which the project will be financed; and (4) the LUC's findings that KD's management plan and the landlord's "ahupua'a plan" would reasonably protect cultural resources are clearly erroneous because these plans were presented only in conceptual form.

In addition to challenging Ka Pa'akai's and PTP's contentions, KD, the LUC, and the County of Hawai'i (the County) allege that neither Ka Pa'akai nor PTP possessed standing to appeal the LUC's decision under HRS § 91–14 (1993).[3]

For the reasons explained below, we hold that: (1) the circuit court did not err in concluding that Ka Pa'akai and PTP had standing to appeal under HRS § 91–14; (2) the LUC did not err in relying on KD's financial disclosure; (3) the LUC did not err in relying on the comments of the DLNR; and (4) the circuit court did not err in failing to specifically rule on four of Ka Pa'akai's

1. By order dated January 9, 1998, this court consolidated Nos. 21124 and 21162 under 21124.

2. "An 'ahupua'a' is a land division usually extending from the mountains to the sea along rational lines, such as ridges or other natural characteristics." *Public Access Shoreline Hawai'i v. Hawai'i County Planning Commission*, 79 Hawai'i 425, 429 n. 1, 903 P.2d 1246, 1250 n. 1 (1995) (quoting *In re Boundaries of Pulehunui*, 4 Haw. 239, 241 (1879) (emphasis and internal quotations deleted)), *certiorari denied*, 517 U.S. 1163, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996).

3. HRS § 91–14(a) provides:
 **Judicial review of contested cases.** (a) Any person aggrieved by a final decision and order

in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.

points of error on appeal. We hold, however, that the LUC's findings of fact and conclusions of law are insufficient to determine whether it fulfilled its obligation to preserve and protect customary and traditional rights of native Hawaiians. The LUC, therefore, must be deemed, as a matter of law, to have failed to satisfy its statutory and constitutional obligations.

We therefore vacate the LUC's grant of KD's petition for land use boundary reclassification and remand to the LUC for the limited purpose of entering specific findings and conclusions, with further hearing if necessary, regarding: (1) the identity and scope of "valued cultural, historical, or natural resources" in the petition area, including the extent to which traditional and customary native Hawaiian rights are exercised in the petition area; (2) the extent to which those resources—including traditional and customary native Hawaiian rights—will be affected or impaired by the proposed action; and (3) the feasible action, if any, to be taken by the LUC to reasonably protect native Hawaiian rights if they are found to exist.

This court—in seeking to maintain a careful balance between native Hawaiian rights and private interests—has made clear that the State and its agencies are obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians to the extent feasible. *Public Access Shoreline Hawai'i v. Hawai'i County Planning Commission* (hereinafter *"PASH"*), 79 Hawai'i 425, 450 n. 43, 903 P.2d 1246, 1271 n. 43 (1995), *certiorari denied*, 517 U.S. 1163, 116 S.Ct. 1559, 134 L.Ed.2d 660 (1996). Today, we provide an analytical framework, discussed below, to help ensure the enforcement of traditional and customary native Hawaiian rights while reasonably accommodating competing private development interests. This urgent need to reach a better balance is underscored by the Hawai'i State legislature's recent finding that, "although the Hawai['i] State Constitution and other state laws mandate the protection and preservation of traditional and customary rights of native Hawaiians," those rights have *not* been adequately preserved or protected:

> [T]he past failure to require native Hawaiian cultural impact assessments has resulted in the loss and destruction of many important cultural resources and has interfered with the exercise of native Hawaiian culture. The legislature further finds that due consideration of the effects of human activities on native Hawaiian culture and the exercise thereof is necessary to ensure the continued existence, development, and exercise of native Hawaiian culture.

Act 50, H.B. NO. 2895, H.D. 1, 20th Leg. (2000).[4]

## I. BACKGROUND

On December 13, 1993, KD filed a petition for boundary amendment with the LUC to reclassify approximately 1,009.086 acres in the ahupua'a of Ka'ūpūlehu, North Kona, State of Hawai'i, from a State Land Use "Conservation District" to a State Land Use "Urban District" (hereinafter the "petition area"). The entire petition area is situated within Hawai'i County's Special Management Area.[5]

Owned by Kamehameha Schools/Bishop Estate (KS/BE) and leased to KD, the crescent-shaped petition area is located at the base of the western slopes of Hualālai and consists largely of pāhoehoe[6] and 'a'ā[7] lava flows. Two well-known physical features of the petition area associated with native Hawaiian culture and history are the coastal point known as Kalaemanō and the historic 1800–1801 Ka'ūpūlehu Lava Flow (the "1800–1801 lava flow"), which covers about one-half of the petition area. Among the well-known

---

**4.** *See infra* note 28 (describing Act 50 in further detail).

**5.** The petition area surrounds a 65–acre portion of land previously reclassified into the urban district in 1979. There is also a 37.064–acre exclusion located in the property, which will remain within the conservation district for archaeological preservation purposes.

**6.** "Pāhoehoe" is a "[s]mooth, unbroken type of lava." Mary Kawena Pukui & Samuel H. Elbert, Hawaiian Dictionary 300 (1986) [hereinafter Pukui & Elbert, Hawaiian Dictionary].

**7.** " 'A'ā" is a "stony" type of lava. Pukui & Elbert, Hawaiian Dictionary, at 2.

individuals associated with the area are King Kamehameha I, Kameʻeiamoku, and his twin brother, Kamanawa.[8]

KD seeks to develop the "Kaupulehu Resort Expansion" (hereinafter the "Resort Expansion" or the "proposed development"), a luxury development consisting of 530 single family homes, 500 low-rise multi-family units, a 36-hole golf course, an 11-acre commercial center, a 3-acre recreation club, a golf clubhouse, and other amenities for the development's residents.

On January 13, 1994, and by written order filed on January 31, 1994, the LUC required KD to prepare an environmental impact statement (EIS), pursuant to HRS chapter 343 and Hawaiʻi Administrative Rules (HAR) chapter 11–200. On September 22, 1994, and by order dated October 5, 1994, the LUC accepted KD's final EIS for the proposed project.

On October 26, 1994, PTP petitioned to intervene in the proceedings, citing its interests, as recreational users of the petition area, in the protection of its natural environment, its scenic, aesthetic, historic, and biological resources—the "Kona Nightingales" and the unique scenic resource of the Kaʻūpūlehu lava flow and the Kalaemanō area. The LUC granted PTP's intervention status on November 25, 1994.[9]

On November 28, 1994, Ka Lāhui and KHCC separately filed petitions to intervene and requested a contested case hearing. Two days later, PKO filed a similar petition. All three groups asserted that their native Hawaiian members' traditional gathering, religious, and cultural practices would be ad-versely affected by the proposed development. On December 1, 1994, and by written order dated December 20, 1994, the LUC consolidated the petitions and granted the groups' requests for intervention and for a contested case hearing.

The hearings commenced on December 1, 1994. During the course of approximately twenty hearings extending through March 1996, the LUC received testimony from approximately forty witnesses and seventy exhibits pursuant to the contested case provisions of HRS chapter 91.[10] Midway through the proceedings, this court issued its decision in *PASH*.

At the close of oral argument, the LUC voted 6–2 to approve KD's petition. On June 17, 1996, the LUC filed its findings of fact, conclusions of law, decision, and order approving KD's petition, which provided in relevant part as follows:

*FINDINGS OF FACT*

. . . .

48. As part of the proposed Project, Petitioner *will develop* and implement a Resource Management Plan ("RMP") which *would coordinate* development with native Hawaiian rights to coastal access for the purpose of traditional cultural practice, West Hawaiʻi's demand for new coastal recreational opportunities, and the creation of a buffer for Kona Village Resort. Under Petitioner's *concept of the RMP*, the goals of the RMP are to provide for resource management and ensure public ac-

---

8. Kameʻeiamoku, chief of Kaʻūpūlehu, and Kamanawa, chief of the adjacent ahupuaʻa, Puʻuwaʻwaʻa, were esteemed advisers to Kamehameha I. Kameʻeiamoku is noted for his capture of the ship, the Fair American, at Kaʻūpūlehu. According to tradition, the twin chiefs were so highly valued that their likenesses appear on the coat of arms of the Kingdom of Hawaiʻi.

As the LUC's findings reveal, the subject property was originally ruled and controlled by early Hawaiian chiefs who passed on the property to their heirs in the line of aliʻi (chiefs) that succeeded Kamehameha I, including Kameʻeiamoku and Kamanawa. Following the Mahele of 1848, the subject property came under the ownership of King Kamehameha V. Kamehameha V's half-sister, Ruth Keʻelikōlani, subsequently inherited the property, which, upon her death, was bequeathed to Princess Bernice Pauahi Bishop. Upon Bernice Pauahi Bishop's death in 1884, the property was included in the Bernice Pauahi Bishop Estate.

9. Kona Village Associates was granted permission to intervene on November 16, 1994, and by written order dated November 25, 1994. On December 20, 1994, the LUC granted Kona Village Associates' request to withdraw its petition for intervention.

10. Under HRS § 205–4(e)(1) (1993), the State Office of Planning and the County of Hawaiʻi Planning Department were automatically made parties to the agency hearing.

cess to the coastal area which balances Petitioner's needs with the traditional needs of native Hawaiians and the recreational needs of the public. Under Petitioner's concept of the RMP, the objectives of the RMP are:

1. To preserve and protect the physical attributes of the coastal area, including the natural topography, geological forms, vegetation, archaeological and cultural resources, trails, intertidal region, and ocean water quality;

2. To develop appropriate lands within the coastal area in a manner that is compatible with an open space character and sensitive to the sustained use of neighboring areas for traditional cultural practices;

3. To preserve and manage sustainable resources within the area to ensure their availability to future generations;

4. To provide access to the coastal area for the recreational use of the community; and

5. To protect fragile and sensitive areas and sustainable resources from overuse and degradation.

49. Petitioner's concept for an RMP establishes five subzones which are based upon the valued resources and activities which are known to exist on and makai[11] of the Property. The subzones differ in the degree of restriction of uses. The subzones will be linked by the historic trail which meanders over the shorefront of the Property and new pedestrian paths.

50. The five subzones constitute a *235-acre resource management area*. Excluding the approximately 37.064–acre archaeological preserve which is proposed to be retained in the State Land Use Conservation District, *the resource management area encompasses approximately 198 acres.*

54. The proposed project can be financed through alternative means. Petitioner may form a joint venture with an independent developer, as Petitioner did in the initial increment of Kaupulehu Resort. In the alternative, Petitioner will fund the initial development itself or will obtain conventional financing. Initial sales revenues will be used to finance subsequent development phases.

. . . .

73. The shoreline portion of the Property is used for fishing and gathering of limu,[12] [']opihi,[13] and other resources, and for camping. The area closest to Kalaeman[ō] was traditionally used for salt gathering. Hannah Springer, a kama'āina[14] of the mauka[15] portion of Ka'upulehu, and her 'ohana[16] have traditionally gathered salt in this area on an occasional basis.

74. The areas for fishing, limu, [']opihi, and salt gathering, and general recreation are to be preserved and managed as part of Petitioner's RMP, thus perpetuating these activities on and makai of the Property.

. . . .

78. The proposed Project will not have a significant adverse impact on archaeological or historic resources. An archaeological inventory survey was conducted on the Property by Paul H. Rosendahl, Inc. Based upon consultation with the State

11. "Makai" is defined as "on the seaside, toward the sea, in the direction of the sea." Pukui & Elbert, Hawaiian Dictionary, at 114, 225.

12. "Limu" is "[a] general name for all kinds of plants living under water, both fresh and salt, also algae growing in any damp place in the air, as on the ground, on rocks, and on other plants[.]" Pukui & Elbert, Hawaiian Dictionary, at 207.

13. " 'Opihi" are "[l]impets. Hawaiians recognize three kinds[.] . . . For some persons, 'opihi are an 'aumakua, [a family or personal god]." Pukui & Elbert, Hawaiian Dictionary, at 32, 292.

14. "Kama'āina" is defined as "[n]ative-born, one born in a place, host[.]" Pukui & Elbert, Hawaiian Dictionary, at 124.

15. "Mauka" is defined as "[i]nland, upland, towards the mountain[.]" Pukui & Elbert, Hawaiian Dictionary, at 242, 365.

16. " 'Ohana" means "[f]amily, relative, kin group; . . . extended family, clan." *PASH*, 79 Hawai'i at 449 n. 41, 903 P.2d at 1270 n. 41 (quoting Pukui & Elbert, Hawaiian Dictionary 276 (2nd ed.1986)).

Historic Preservation Division ("SHPD") and a final survey report, 193 sites were identified, and 65 sites have been recommended for some form of preservation. Thirty-eight of those recommended for preservation are contained within a designated preserve area.

79. The identified archaeological sites were assessed for significance, based upon the National Register Criteria for Evaluation, as outlined in the Code of Federal Regulation (36 CFR, Part 65). The SHPD uses these criteria for evaluating such sites.

. . . .

85. Except for certain archaeological sites which are within a preserve area located inland and to the east of Kona Village Resort, cultural resources are found near the shoreline of the Property.

86. Wahi pana are the storied, remarkable places, the legendary places of significance in native Hawaiian culture.

·87. While the ahupua'a of Ka'upulehu is by story and the history of its name a wahi pana, there are no specific wahi pana which are definitely known to be within the Property, based on historical documentary research and interviews.

88. The proposed Project will reasonably preserve and perpetuate cultural resources such as archaeological sites, the coastal trail, areas of fishing, [']opihi, and limu gathering, salt gathering, and general recreation *in the proposed areas within Petitioner's RMP*. Petitioner's RMP area totals approximately 235 acres.

89. KS/BE has formulated a plan to manage and protect cultural resources within the entire ahupua'a of Ka'upulehu. Petitioner's RMP will be consistent with and further the objective of the ahupua'a plan. KSBE's ahupua'a plan includes designated geographic zones that define the natural, cultural, and historic resources of Ka'upulehu from the mountain to the sea. The ahupua'a plan *will involve* native Hawaiians, particularly the 'ohana who are kama'aina to the subject Property, to relink the traditions and practices that are rooted in that Property. KSBE will form a non-profit entity in perpetuity to oversee the formulation and implementation of the Ka'upulehu ahupua'a plan.

. . . .

114. The proposed reclassification of the Property generally conforms to the following State functional plans, as defined in chapter 226, HRS:

. . . .

e. Historic Preservation Functional Plan. The objective, policies, and implementing actions of this functional plan are supported through Petitioner's compliance with all applicable State, County, and Federal requirements concerning historic sites.

. . . .

116. The proposed reclassification of the Property is in general conformance with the following elements of the Hawai'i County General Plan: economic, environmental quality, flood control and drainage, historic sites, housing, natural beauty, natural resources and shoreline, recreation, and land use.

. . . .

117. The proposed reclassification of the Property is in general conformance with the objectives and policies in section 205A–2, HRS, in the following ways:

. . . .

b. Historic Resources Objective: Protect, preserve, and where desirable, restore those natural and manmade historic and prehistoric resources in the coastal zone management area that are significant in Hawaiian and American history and culture. All significant archaeological resources identified on the Property are proposed for preservation by Petitioner.

## CONCLUSIONS OF LAW

Pursuant to chapter 205, HRS, and the Hawai'i Land Use Commission Rules under chapter 15–15, HAR, and upon consideration of the Land Use Commission decision-making criteria under section 205–17, HRS, this Commission finds upon a clear preponderance of the evidence that the

reclassification of the Property, consisting of approximately 1,009.086 acres of land in the State Land Use Conservation District at Kaʻupulehu, North Kona, Island, County, and State of Hawaiʻi, identified as TMK No. 7-2-03: por. 1, into the State Land Use Urban District, is reasonable, conforms to the standards for establishing the Urban District boundaries, is non-violative of section 205-2, HRS, and is consistent with the Hawaiʻi State Plan as set forth in chapter 226, HRS, and with the policies and criteria established pursuant to section § 205-17 and 205A-2, HRS.

### DECISION AND ORDER

IT IS HEREBY ORDERED that ... Kaupulehu Developments ... is hereby reclassified into the State Land Use Urban District, and the State land use district boundaries are amended accordingly, subject to the following conditions:

. . . .

18. *Petitioner shall preserve and protect any gathering and access rights of native Hawaiians who have customarily and traditionally exercised subsistence, cultural and religious practices on the subject property.*

. . . .

19. In developing and operating the golf course and residential development in the Kaupulehu Resort Development Project, Petitioner shall at a minimum protect public access along the accessible coastline by the following:

. . . .

19b. Petitioner shall develop and implement the Resource Management Plan as represented to the LUC and which shall be consistent with and further the objectives of KSBE's ahupuaʻa plan. Petitioner shall develop the Resource Management Plan in consultation with the Department of Land and Natural Resources and the Office of State Planning. A copy of the Resource Management Plan shall be filed with the LUC prior to filing

any request for zoning amendment with the County. In developing the Resource Management Plan and operating the golf course and any future residential development in the Kaupulehu Development Petition Area, Petitioner shall maintain and protect the public's right of access along the shoreline especially at the 1800-1801 aʻa lava flow where the existing trail is near the same level as the proposed dwelling units.

(Emphases added.)

KHCC, PKO, Ka Lāhui, and PTP filed separate timely agency appeals from the LUC's order to the third circuit court. By stipulation, the circuit court consolidated the agency appeals on September 14, 1996.

The circuit court heard oral arguments on the consolidated appeals on July 7, 1997. On August 20, 1997, the circuit court entered its findings of fact, conclusions of law, decision, and order. On August 29, 1997, the circuit court entered its amended findings of fact and conclusions of law, providing in pertinent part the following:

### CONCLUSIONS OF LAW

. . . .

2. In light of the threatened destruction of the cultural resources and historic properties in the petition area, Appellants are "aggrieved" as a result of the LUC's Order and also have standing to obtain judicial review of the LUC's Order under Hawaiʻi Revised [Statutes] Sections § 91-14 and § 205-4(i).

3. In the absence of a statute requiring the agency to promulgate specific rules, an agency has discretion to proceed by rule-making or, alternatively by adjudication, as was done here. *Application of Hawaiian Electric Company, Inc.*, 81 Hawaiʻi 459, 918 P.2d 561 (1996).

4. There has been no showing by Appellant that the LUC abused its discretion by electing to consider the subject of "cultural resources" by adjudication, rather than rule-making. It is also noted that the LUC does have rules which conform to the statutory criteria in HRS § 205-17(3)(B)

and which require it to consider the impact of the proposed reclassification on, inter alia, "[m]aintenance of valued cultural, historical, or natural resources." Hawai'i Administrative Rules § 15–15–77.

6[sic]. As to the issue of whether the LUC improperly considered comments from another agency, the Department of Land and Natural Resources ("DLNR"), because DLNR has allegedly failed to promulgate specific rules on cultural resources pursuant to HRS Chapter 6E, the record reveals no error or impropriety.

. . . .

8. Hawai'i Revised Statutes § 205–17 states that in its review of any petition for reclassification of district boundaries pursuant to this chapter, the commission shall specifically consider the following:

. . . .

(3) The impact of the proposed reclassification on the following areas of state concern:

. . . .

(B) Maintenance of valued cultural, historical, or natural resources[.]

9. The LUC's Findings of Fact, Conclusions of law, and Decision and Order comply with HRS § 205–17.

10. The LUC's Decision includes requisite findings which are supported by substantial evidence.

11. The Court has reviewed the record and determined that the LUC's findings of fact are not clearly erroneous in view of the reliable, probative and substantial evidence on the whole record and are supported by a clear preponderance of the evidence.

12. Hawai'i Revised Statutes § 91–14(g) provides that even assuming error, the LUC's Decision may only be modified or reversed if the substantial rights of the Appellants have been prejudiced. Appellants have not discharged their burden of making a convincing showing that the decision is unjust and unreasonable in its consequences. *In re Hawaiian [Hawaii] Electric Light, Co.*, 60 Haw. 625, 630, 594 P.2d 612, 617 (1979).

Based on the foregoing, and pursuant to HRS [§ ] 91–14(g) and HRS § 205–4(i),

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

That the LUC's Findings of Fact, Conclusions of Law, Decision and Order issued June 17, 1996, is hereby affirmed in all respects.

On September 30, 1997, the circuit court entered judgment affirming the LUC's decision.

Ka Pa'akai and PTP timely appealed.

## II. *STANDARDS OF REVIEW*

■ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) to the agency's decision.

*Curtis v. Board of Appeals, County of Hawai'i*, 90 Hawai'i 384, 392, 978 P.2d 822, 830 (1999) (quoting *Konno v. County of Hawai'i*, 85 Hawai'i 61, 77, 937 P.2d 397, 413 (citations omitted)). This court's review is further qualified by the principle that decisions of administrative bodies acting within their sphere of expertise are accorded a presumption of validity. *Southern Foods Group, L.P. v. State of Hawai'i, DOE*, 89 Hawai'i 443, 453, 974 P.2d 1033, 1043 (1999) (citing *In re Application of Hawai'i Electric Light Co., Inc.*, 60 Haw. 625, 630, 594 P.2d 612, 617 (1979)).

HRS § 91–14(g) (1993) enumerates the standards of review applicable to an agency appeal and provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Curtis,* 90 Hawai'i at 392–93, 978 P.2d at 830–31 (quoting *GATRI v. Blane,* 88 Hawai'i 108, 112, 962 P.2d 367, 371 (1998) (citing *Poe v. Hawai'i Labor Relations Board,* 87 Hawai'i 191, 194–95, 953 P.2d 569, 572–73 (1998))).

■ "An agency's findings of fact are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record." *Id.* at 393, 978 P.2d at 831 (quoting *Alvarez v. Liberty House, Inc.,* 85 Hawai'i 275, 277, 942 P.2d 539, 541 (1997); HRS § 91–14(g)(5). "An agency's conclusions of law are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law." *Id.* (quoting *Hardin v. Akiba,* 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997) (citations omitted); HRS §§ 91–14(g)(1), (2), and (4)).

■ "The interpretation of a statute is a question of law reviewable de novo." *Amantiad v. Odum,* 90 Hawai'i 152, 160, 977 P.2d 160, 168–69 (1999) (quoting *Franks v. City & County of Honolulu,* 74 Haw. 328, 334, 843 P.2d 668, 671 (1993)).

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained ·in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Id.* (quoting *Gray v. Administrative Dir. of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (internal citations, quotation marks, brackets, ellipses, and footnote omit-

ted)). This court may also consider "the reason and spirit of the law, and the cause which induced the legislature to enact it[ ] . . . to discover its true meaning." *Id.* (quoting *Gray,* 84 Hawai'i at 148 n. 15, 931 P.2d at 590 n. 15; HRS § 1–15(2) (1993)).

■ Although judicial deference to agency expertise is generally accorded where the interpretation and application of broad or ambiguous statutory language by an administrative tribunal are subject to review, "this deference is constrained by [our] obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history." *Armbruster v. Nip,* 5 Haw.App. 37, 43, 677 P.2d 477, 482 (quoting *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979)), *reconsideration denied,* 5 Haw.App. 682, 753 P.2d 253, *certiorari denied,* 67 Haw. 685, 744 P.2d 781 (1984). Furthermore, "where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous." *Brown v. Thompson,* 91 Hawai'i 1, 18, 979 P.2d 586, 602 (1999) (quoting *Keliipuleole v. Wilson,* 85 Hawai'i 217, 226, 941 P.2d 300, 309 (1997) (quoting *Treloar v. Swinerton & Walberg Co.,* 65 Haw. 415, 424, 653 P.2d 420, 426 (1982)), *certiorari denied,* 528 U.S. 1010, 120 S.Ct. 511, 145 L.Ed.2d 395 (1999). *See also Aio v. Hamada,* 66 Haw. 401, 407, 664 P.2d 727, 731 (1983).

■ We answer questions of constitutional law by exercising our own " 'independent constitutional judgment [based] on the facts of the case.' " *State v. Sua,* 92 Hawai'i 61, 68, 987 P.2d 959, 966 (1999) (quoting *State v. Lee,* 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996)(quoting *Crosby v. State Dep't of Budget & Fin.,* 76 Hawai'i 332, 341, 876 P.2d 1300, 1309 (1994) (citation omitted)). We have long recognized that this court is the "ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawai'i Constitution." *State v. Quitog,* 85 Hawai'i 128, 130 n. 3, 938 P.2d 559 n. 3 (1997) (quoting *State v. Arceo,* 84 Hawai'i 1,

28, 928 P.2d 843, 870 (1996) (citation omitted)).

### III. *DISCUSSION*

A. *The circuit court did not err in concluding that Ka Pa'akai and PTP had standing to appeal under HRS § 91–14.*

KD and the LUC argue that the circuit court lacked jurisdiction to consider Ka Pa'akai's and PTP's appeals because neither Ka Pa'akai's nor PTP's interests were injured by the LUC's decision. KD specifically contends that, because Ka Pa'akai's and PTP's interests "have been served, not injured," inasmuch as the LUC's decision was a "favorable" one, Ka Pa'akai and PTP lack standing to appeal. This argument is untenable.

 The appeal of the LUC's action on a boundary amendment petition is governed by HRS § 91–14. *See* HRS § 205–4(i) (1993). Under HRS § 91–14, a "person aggrieved by a final decision and order in a contested case ... is entitled to judicial review[.]" In *PASH*, we stated that, in order to establish standing for purposes of HRS § 91–14, a party must, *inter alia*, "demonstrate [that its] ... interests were injured[.]"[17] *PASH*, 79 Hawai'i at 434, 903 P.2d at 1255 (citing *Pele Defense Fund v. Puna Geothermal Venture*, 77 Hawai'i 64, 69, 881 P.2d 1210, 1215(1994)). The demonstration is evaluated via a three-part "injury in fact" test requiring: "(1) an actual or threatened injury, which, (2) is traceable to the challenged action, and (3) is likely to be remedied by favorable judicial action." *Citizens for the Protection of the North Kohala Coastline v. County of Hawai'i*, 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999) (citing *PASH*, 79 Hawai'i at 434 n. 15, 903 P.2d at 1255 n. 15 (citation omitted)).

 With regard to native Hawaiian standing, this court has stressed that "the rights of native Hawaiians are a matter of great public concern in Hawai[']i." *Pele Defense Fund v. Paty*, 73 Haw. 578, 614, 837 P.2d 1247, 1268 (1992), *certiorari denied*, 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993). Our "fundamental policy [is] that Hawaii's state courts should provide a forum for cases raising issues of broad public interest, and that the judicially imposed standing barriers should be lowered when the "needs of justice" would be best served by allowing a plaintiff to bring claims before the court." *Id.* at 614–15, 837 P.2d at 1268–69 (citing *Life of the Land v. The Land Use Comm'n*, 63 Haw. 166, 176, 623 P.2d 431, 441 (1981)).

We have also noted that, "where the interests at stake are in the realm of environmental concerns[,] 'we have not been inclined to foreclose challenges to administrative determinations through restrictive applications of standing requirements.'" *Citizens*, 91 Hawai'i at 100–01, 979 P.2d at 1126–27 (quoting *Mahuiki v. Planning Commission*, 65 Haw. 506, 512, 654 P.2d 874, 878 (1982) (quoting *Life of the Land*, 63 Haw. at 171, 623 P.2d at 438))). Indeed, "[o]ne whose legitimate interest is in fact injured by illegal action of an agency or officer should have standing because justice requires that such a party should have a chance to show that the action that hurts his interest is illegal." *Mahuiki*, 65 Haw. at 512–13, 654 P.2d at 878 (quoting *East Diamond Head Association v. Zoning Board of Appeals*, 52 Haw. 518, 523 n. 5, 479 P.2d 796, 799 n. 5 (1971) (citations omitted)). *See also Mahuiki*, 65 Haw. at 515, 654 P.2d at 880 (those who show aesthetic and environmental injury are allowed standing to invoke judicial review of an agency's decision under HRS chapter 91 where their interests are "personal" and "special," or where a property interest is also affected) (citing *Life of the Land v. Land Use Commission*, 61

---

17. As we articulated in *PASH*, four requirements must be met in order to appeal from an agency's decision under HRS § 91–14: "first, the proceeding that resulted in the unfavorable agency action must have been a 'contested case' hearing ...; second, the agency's action must represent 'a final decision and order,' or 'a preliminary ruling' such that deferral of review would deprive the claimant of adequate relief; third, the claimant must have followed the applicable agency rules and, therefore, have been involved 'in' the contested case; and finally, the claimant's legal interests must have been injured—i.e., the claimant must have standing to appeal." 79 Hawai'i at 431, 903 P.2d at 1252. There is no dispute that Ka Pa'akai and PTP participated in the contested case hearing and that the LUC's action was a final decision and order.

Haw. 3, 8, 594 P.2d 1079, 1082 (1979)); *Akau v. Olohana Corporation*, 65 Haw. 383, 390, 652 P.2d 1130, 1135 (1982) (an injury to a recreational interest is an injury in fact sufficient to constitute standing to assert the rights of the public for purposes of declaratory and injunctive relief); *Life of the Land*, 63 Haw. at 176–77, 623 P.2d at 441 (group members had standing to invoke judicial intervention of LUC's decision "even though they are neither owners nor adjoining owners of land reclassified by the Land Use Commission in [its] boundary review"); *Life of the Land*, 61 Haw. at 8, 594 P.2d at 1082 (group members who lived in vicinity of reclassified properties and used the subject area for "diving, swimming, hiking, camping, sightseeing, horseback riding, exploring and hunting and for aesthetic, conservational, occupational, professional and academic pursuits," were specially, personally and adversely affected by LUC's decision for purposes of HRS § 91–14).

### 1. Ka Paʻakai

█ In the instant case, Ka Paʻakai sufficiently demonstrated that the LUC's June 13, 1996 decision would adversely affect its native Hawaiian members' traditional gathering, religious, and cultural practices within the petition area. Ka Paʻakai's members averred that they, their ancestors, friends, and families have crossed the 1800–1801 lava flow to gather salt for subsistence and religious purposes on and around the petition area over a long period of time. They further asserted that "the petition area is associated with important personages and events in Hawaiian history, contains well-known physical entities (such as the shoreline, Ka Lae Mano and the 1800–1801 lava flow) and remnants of the native tenants' lateral shoreline and mauka-makai trail system, living areas and burials. Reports of a kiʻi[ [18]] being found in the petition area were also confirmed by Petitioner's landlord and expert."

Ka Paʻakai further argued that its members' interests as native Hawaiians, and as tenants of the ahupuaʻa of Kaʻūpulehū, would be impaired by the proposed development regarding the use of ancient trails and the shoreline area to practice traditional and customary gathering rights. The group generally contended that its members use the petition area for fishing, gathering salt, ʻopihi, limu, kūpeʻe,[19] Pele's Tears,[20] and hāʻukeʻuke,[21] and that the 1800–1801 lava flow held special religious significance for Hawaiians. It specifically argued, *inter alia,* that the LUC's illegal delegation of the protection and preservation of cultural resources and native Hawaiian rights to the developer endangered its members' gathering activities and negatively impacted their access rights.

Ka Paʻakai's members—as native Hawaiians who have exercised such rights as were customarily and traditionally exercised for subsistence, cultural, and religious purposes—sufficiently demonstrated injury to their interests for purposes of appeal under HRS chapter 91. The circuit court thus properly concluded that Ka Paʻakai had standing to invoke judicial resolution of the LUC's decision.

### 2. PTP

█ PTP likewise established personal and special interests sufficient to invoke judicial review under HRS § 91–14. PTP alleged facts to show that its members were recreational users of the petition area, using it for "hiking, fishing, and other food gathering, and camping[,]" and that the LUC's action would "diminish" such use. Its members also asserted their interests in protecting the natural environment of West Hawaiʻi, its scenic, aesthetic, historic, and biological resources—the protection of the "Kona Nigh-

---

18. A "kiʻi" is an "[i]mage, statue, picture, photograph, drawing, diagram, illustration, likeness, cartoon, idol, doll, petroglyph[.]" Pukui & Elbert, Hawaiian Dictionary, at 148.

19. "Kūpeʻe" are "edible marine snail[s] [whose] shells are used for ornaments; the rare ones by chiefs." Pukui & Elbert, Hawaiian Dictionary, at 185.

20. "Pele's tears" are described as "tear drops made from pāhoehoe lava. They usually have a point on each end.... They're lava formations." [LUC TR 1/18/96, at 104]

21. "Hāʻukeʻuke" is "an edible variety of sea urchin [whose] teeth were used for medicine." Pukui & Elbert, Hawaiian Dictionary, at 60.

**44**

tingales" and the preservation of Hawaiian archaeological sites, the Ala Kahakai, and the unique scenic resource of the Ka'ūpūlehu lava flow and the Kalaemanō area.

PTP additionally contended that the proposed development would adversely affect the pristine nature, scenic views, and open coastline of the area now enjoyed by its members. Like Ka Pa'akai, PTP submitted that the LUC's improper delegation of its authority to KD, in violation of *PASH*, would impair its members' use and enjoyment of the petition area.

Based on our review of the record, PTP sufficiently demonstrated an "injury in fact." As in *Citizens* and *Mahuiki, supra*, we perceive no sound reason to foreclose PTP's challenges through a restrictive application of standing requirements. We therefore hold that, because both Ka Pa'akai and PTP are "person[s] aggrieved" within the meaning of HRS § 91–14, the circuit court did not err in concluding that both groups had standing to seek judicial review of the LUC's decision.[22]

B. *The Land Use Commission's obligations to preserve and protect customary and traditional practices of native Hawaiians*

PTP asserts that the LUC failed to ensure that legitimate customary and traditional practices of native Hawaiians were protected "to the extent feasible." Correlatively, Ka Pa'akai contends that the LUC abused its discretion in arbitrarily and capriciously delegating its authority to consider the effect of the proposed development on such rights to KD and its landlord. We agree with both contentions and, in vacating and remanding the LUC's order, take the opportunity to review the LUC's obligations when acting upon a petition for land use boundary reclassification.

1. *The LUC's obligations to independently assess the impact of the proposed reclassification on traditional and customary practices of Hawaiians*

Under HRS § 205–17(3)(B), "[i]n its review of any petition for reclassification of

district boundaries pursuant to this chapter, the [Land Use C]ommission shall *specifically consider* the following: ... The *impact* of the proposed reclassification on the following areas of state concern: ... Maintenance of *valued cultural, historical, or natural resources* [.]" (Emphases added.) HRS § 205–4(h) mandates that "[n]o amendment of a land use district boundary shall be approved unless the commission finds upon the clear preponderance of the evidence that the proposed boundary is ... consistent with the policies and criteria established pursuant to sections 205–16 and 205–17."

In accordance with those statutory directives, Hawai'i Administrative Rule (HAR) § 15–15–77 provides that the LUC, "in its review of any petition for reclassification of district boundaries ... shall specifically consider the following; ... [t]he impact of the proposed reclassification on the following areas of state concern: ... [m]aintenance of valued cultural, historical, or natural resources." HAR § 15–15–77 (1986). In order to comply with HRS § 205–4(h)'s mandate, the LUC is required to enter specific findings that, *inter alia*, the proposed reclassification is consistent with the policies and criteria of HRS § 205–17(3)(B). Such findings "are subsidiary findings of basic facts and are necessary to support the ultimate finding" that the criteria of HRS § 205–17 have been met. *See Kilauea Neighborhood Ass'n v. LUC*, 7 Haw.App. 227, 230, 751 P.2d 1031, 1034 (1988) ("Under [HRS] § 205–4(g), the LUC is required to file findings of fact and conclusions of law when acting upon a petition for reclassification.... [I]n order to allow [an appellate] court to track the steps by which the LUC reached its finding that a land use boundary amendment complies with the provisions of [HRS] § 205–16.1, ... it [is] necessary for the LUC to make findings on the pertinent criteria established there. Such findings are subsidiary findings of basic facts and are necessary to support the ultimate finding that the criteria of § 205–16.1

---

22. Accordingly, we note that KD's contention that Ka Pa'akai's and PTP's interests have been

"served" is wholly immaterial to a determination of standing.

have been met.").[23] *See also Hui Alaloa v. Planning Commission of the County of Maui,* 68 Hawai'i 135, 136, 705 P.2d 1042, 1044 (1985) ("The planning commission, in order to comply with the CZMA mandate, is required to make findings that the proposed development projects are consistent with [the CZMA's] policies and objectives.")

 In addition to its specific statutory obligations, the LUC is required under the Hawai'i Constitution to preserve and protect customary and traditional practices of native Hawaiians. Under Article XII, section 7 of the Hawai'i Constitution,

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

This provision places an affirmative duty on the State and its agencies to preserve and protect traditional and customary native Hawaiian rights, and confers upon the State and its agencies "the power to protect these rights and to prevent any interference with the exercise of these rights." Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of 1978, at 639 (1980). *See also PASH,* 79 Hawai'i at 437, 903 P.2d at 1258; HRS §§ 1–1 [24] and 7–1 [25] (providing two additional sources from which gathering rights are derived). Article XII,

section 7's mandate grew out of a desire to "preserve the small remaining vestiges of a quickly disappearing culture [by providing] a legal means by constitutional amendment to recognize and reaffirm native Hawaiian rights." Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of 1978, at 640. The Committee on Hawaiian Affairs, in adding what is now article XII, section 7, also recognized that "[s]ustenance, religious and cultural practices of native Hawaiians are an integral part of their culture, tradition and heritage, with such practices forming the basis of Hawaiian identity and value systems." Comm. Whole Rep. No. 12, in 1 Proceedings of the Constitutional Convention of 1978, at 1016.

 In the judicial decisions following its enactment, this court reemphasized that "the reasonable exercise of ancient Hawaiian usage is entitled to protection under article XII, section 7." *See PASH,* 79 Hawai'i at 442, 903 P.2d at 1263. *See also Kalipi v. Hawaiian Trust Co., Ltd.,* 66 Haw. 1, 656 P.2d 745 (1982) (recognizing Hawai'i's constitutional mandate to protect traditional and customary native Hawaiian rights); *Pele Defense Fund,* 73 Haw. at 620, 837 P.2d at 1272 (reaffirming the "rudiments of native Hawaiian rights protected by article XII, § 7" of the Hawai'i Constitution). In *PASH,* we stated that "[t]he State's power to regulate the exercise of customarily and traditionally exercised Hawaiian rights ... necessarily allows the State to permit development that interferes

---

**23.** Additionally, because the petition area lies in the special management area, the LUC was required to implement the objectives and policies of the Coastal Zone Management Act (CZMA). HRS § 205A–4 specifically requires that all agencies within their scope of authority "give 'full consideration ... to cultural ... [and] historic ... values as well as to needs for economic development' " when implementing the objectives and policies of the Coastal Zone Management Program. *PASH,* 79 Hawai'i at 435, 903 P.2d at 1256 (citing HRS § 205A–4(a)) (emphasis deleted).

**24.** HRS § 1–1 provides:
 The common law of England as ascertained by English and American decisions, is declared to be the common law of the State of Hawai'i in all cases, except as otherwise provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawai-

ian judicial precedent, or established by Hawaiian usage; provided that no person shall be subject to criminal proceedings except as provided by the written laws of the United States of the State.

**25.** HRS § 7–1 states:
 Where landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have the right to take such articles to sell for profit. The people shall also have the right to drinking water, and roads shall be free to all on all lands granted in fee simple; provided that this shall not be applicable to well and watercourses, which individuals have made for their own use.

with such rights in certain circumstances. . . . Nevertheless, *the State is obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians to the extent feasible.*" *PASH,* 79 Hawai'i at 450 n. 43, 903 P.2d at 1271 n. 43 (emphasis added). As such, state agencies such as the LUC may not act without independently considering the effect of their actions on Hawaiian traditions and practices. *See id.* at 437, 903 P.2d at 1258.

This court has also continued to recognize the powerful historical basis for ensuring the protection of traditional and customary Hawaiian rights. We have observed, for example, that the introduction of Western private property concepts profoundly limited native Hawaiians' traditional system of land tenure and subsistence. *See Kalipi,* 66 Haw. at 6–7, 656 P.2d at 749 ("In ancient times . . . [t]he native people existed by a subsistence economy and the division of land . . . enabled persons within it to obtain virtually all things necessary to survival. . . . With the coming of the influence of the west, the traditional system became increasingly less viable. A trading economy gradually replaced the subsistence economy and the land and its resources came to have a value apart from the labor of those who worked it."). *See also Pele Defense Fund,* 73 Haw. at 618–621, 837 P.2d at 1270–72 (discussing historically exercised access and gathering rights for subsistence, *cultural or religious purposes); PASH,* 79 Hawai'i at 445–447, 903 P.2d at 1266–68 (describing relevant legal developments in Hawaiian history regarding land tenure).[26]

In *PASH,* this court had occasion to address, *inter alia,* whether the Hawai'i Planning Commission was required to protect the traditional and customary practices of the nature asserted by PASH. *Id.* at 439, 903 P.2d at 1260. In this case, the LUC's duty to protect the traditional and customary practices asserted by the native Hawaiian members of Ka Pa'akai and PTP is undisput-

ed. We are therefore called on to determine whether the LUC discharged that duty.

### 2. Analytical framework

Article XII, section 7 of the Hawai'i Constitution obligates the LUC to protect the reasonable exercise of customarily and traditionally exercised rights of native Hawaiians *to the extent feasible* when granting a petition for reclassification of district boundaries. *See PASH,* 79 Hawai'i at 450 n. 43, 903 P.2d at 1271 n. 43 (emphasis added). In order for the rights of native Hawaiians to be meaningfully preserved and protected, they must be enforceable. In order for native Hawaiian rights to be enforceable, an appropriate analytical framework for enforcement is needed. Such an analytical framework must endeavor to accommodate the competing interests of protecting native Hawaiian culture and rights, on the one hand, and economic development and security, on the other. *See PASH,* 79 Hawai'i at 447, 903 P.2d at 1268 ("A community development proposing to integrate cultural education and recreation with tourism and community living represents a promising opportunity to demonstrate the continued viability of Hawaiian land tenure ideals in the modern world."); *Kalipi,* 66 Haw. at 7, 656 P.2d at 749 ("Our task is thus to conform these traditional rights born of a culture which knew little of the rigid exclusivity associated with the private ownership of land, with a modern system of land tenure in which the right of an owner to exclude is perceived to be an integral part of fee simple title."); Comm. Whole Rep. No. 12, in 1 Proceedings of the Constitutional Convention of 1978, at 1016 (1980) ("it is possible, with work, to both protect the rights of private landowners and allow for the preservation of an aboriginal people").

We therefore provide this analytical framework in an effort to effectuate the State's obligation to protect native Hawaiian

---

26. *See also* Native Hawaiian Rights Handbook 223 (1991) (Melody Kapilialoha MacKenzie, ed.) (recognizing that "the tension between Western private property concepts and the exercise of native gathering rights has resulted in increasing limitations on those rights"); D. Kapua Sproat,

*The Backlash Against PASH: Legislative Attempts to Restrict Native Hawaiian Rights,* 20 U. Haw. L.Rev. 321 (1998) (describing, among other things, the historical basis for traditional and customary practices).

customary and traditional practices while reasonably accommodating competing private interests: In order to fulfill its duty to preserve and protect customary and traditional native Hawaiian rights to the extent feasible, the LUC, in its review of a petition for reclassification of district boundaries, must—*at a minimum*—make specific findings and conclusions as to the following: (1) the identity and scope of "valued cultural, historical, or natural resources" [27] in the petition area, including the extent to which traditional and customary native Hawaiian rights are exercised in the petition area; (2) the extent to · which those resources—including traditional and customary native Hawaiian rights—will be affected or impaired by the proposed action; and (3) the feasible action, if any, to be taken by the LUC to reasonably protect native Hawaiian rights if they are found to exist.[28]

27. We decline to define the term, "cultural resources." "Cultural resources" is a broad category, of which native Hawaiian rights is only one subset. In other words, we do not suggest that the statutory term, "cultural resources" is synonymous with the constitutional term, customary and traditional native Hawaiian rights.

28. Importantly, we note that the 2000 Hawai'i State legislature passed H.B. No. 2895, H.D. 1, entitled, "A Bill for an Act Relating to Environmental Impact Statements." It amends HRS § 343-2 to include the effects of economic development on *cultural practices:*

"Environmental impact statement" or "statement" means an informational document prepared in compliance with the rules adopted under section 343-6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and *cultural practices* of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.
. . . .
"Significant effect" means the sum of effects on the quality of the environment, including actions that . . . adversely affect the economic welfare, social welfare, or cultural practices of the community and State.

In enacting the provision, the legislature found that "there is a need to clarify that the preparation of environmental assessments or environmental impact statements should identify and address effects on Hawai'i's culture, and *traditional and customary rights.*" (Emphasis added.) It recognized that "the native Hawaiian culture

3. *The LUC's findings and conclusions are insufficient to allow a determination as to whether it fulfilled its constitutional obligation to preserve and protect customary and traditional rights of native Hawaiians.*

In this case, the LUC entered a handful of findings potentially implicating native Hawaiian rights. In FOF No. 48, the LUC found that KD will, in the future, establish its RMP to, among other things, balance KD's interest with the "traditional needs" of Hawaiians:'

48. As part of the proposed Project, Petitioner *will develop* and implement a Resource Management Plan ("RMP") which *would coordinate* development with native Hawaiian rights to coastal access for the purpose of traditional cultural practice, West Hawai'i's demand for new coastal recreational opportunities, and the creation

plays a vital role" in the preservation of Hawai'i's "aloha spirit" and that "Articles IX and XII of the state constitution, other state law, and the courts of the State impose on government agencies a duty to promote and protect cultural beliefs, practices, and resources of native Hawaiians as well as other ethnic groups." Most importantly, it observed that

the past failure to require native Hawaiian cultural impact assessments has *resulted in the loss and destruction of many important cultural resources and has interfered with the exercise of native Hawaiian culture.* The legislature further finds that due consideration of the effects of human activities on native Hawaiian culture and the exercise thereof is necessary to ensure the continued existence, development, and exercise of native Hawaiian culture.

(Emphasis added.) *See also* Stand. Comm. Rep. No. 3298 (observing that, "although the Hawai'i State Constitution and other state laws mandate the protection and preservation of the traditional and customary rights of native Hawaiians, the failure to require environmental impact statements to disclose the effect of a proposed action on cultural practices has resulted in the loss of important cultural resources. Your Committee believes that this measure will result in a *more thorough consideration of an action's potential adverse impact on Hawaiian culture and tradition, ensuring the culture's protection and preservation.*") (Emphasis added.) The bill was subsequently signed into law by Governor Benjamin Cayetano as Act 50.

We note that, while H.B. 2895 does not apply retroactively to the case at hand, its requirements and purposes provide strong support for the framework we have articulated herein.

of a buffer for Kona Village Resort. Under Petitioner's *concept of the RMP,* the goals of the RMP are to provide for resource management and ensure public access to the coastal area which balances Petitioner's needs with the traditional needs of native Hawaiians and the recreational needs of the public.

The LUC then identified some of the "resources" found within the petition area and observed, in particular, that Hannah Springer and her family have traditionally gathered salt in the Kalaemanō area:

> 73. The shoreline portion of the Property is used for fishing and gathering of limu, [']opihi, and other resources, and for camping. The area closest to Kalaeman[ō] was traditionally used for salt gathering. Hannah Springer, a kama'aina of the mauka portion of Ka'upulehu, and her 'ohana have traditionally gathered salt in this area on an occasional basis.

The LUC found that these resources would be preserved as part of KD's 235–acre RMP. This RMP, according to the LUC's findings, would be consistent with KS/BE's ahupua'a plan, which would, in the future, involve native Hawaiians in its implementation:

> 74. The areas for fishing, limu, [']opihi, and salt gathering, and general recreation are to be preserved and managed as part of Petitioner's RMP, thus perpetuating these activities on and makai of the Property.
>
> . . . .
>
> 88. The proposed Project will reasonably preserve and perpetuate cultural resources such as archaeological sites, the coastal trail, areas of fishing, [']opihi, and limu gathering, salt gathering, and general recreation in the proposed areas within Petitioner's RMP. Petitioner's RMP area totals approximately 235 acres.
>
> 89. KS/BE has formulated a plan to manage and protect cultural resources within the entire ahupua'a of Ka'upulehu. *Peti-*

*tioner's RMP will be consistent with* and further the objective of the ahupua'a plan. KSBE's ahupua'a plan includes designated geographic zones that define the natural, cultural, and historic resources of Ka'upulehu from the mountain to the sea. The ahupua'a plan *will involve native Hawaiians,* particularly the 'ohana who are kama'aina to the subject Property, to re-link the traditions and practices that are rooted in that Property. KSBE will form a non-profit entity in perpetuity to oversee the formulation and implementation of the Ka'upulehu ahupua'a plan.

Condition No. 18 of the boundary amendment provided that "Petitioner shall preserve and protect any gathering and access rights of native Hawaiians who have customarily and traditionally exercised subsistence, cultural and religious practices on the subject property." The LUC also noted that KD "will develop and implement its RMP which would in the future coordinate development with native Hawaiian rights, recreational opportunities, and the creation of a buffer for Kona Village Resort."

A review of the record and the LUC's decision leads us to the inescapable conclusion that the LUC's findings and conclusions are insufficient to determine whether it discharged its duty to protect customary and traditional practices of native Hawaiians to the extent feasible. The LUC, therefore, must be deemed, as a matter of law, to have failed to satisfy its statutory and constitutional obligations.

First, apart from its finding that "Hannah Springer, a kama'aina of the mauka portion of Ka'upulehu, and her 'ohana have traditionally gathered salt in this area on an occasional basis," the LUC failed to enter any definitive findings or conclusions as to the extent of the native Hawaiian practitioners' exercise of customary and traditional practices in the subject area.[29] Instead, as discussed further

---

29. Although the LUC found that "[t]he shoreline portion of the Property is used for fishing and gathering of limu, [']opihi, and other resources, and for camping[,]" it did not indicate whether any of these uses were customarily and/or traditionally exercised by Hawaiians on the subject property.

Some group members also testified that they gathered hā'uke'uke, kūpe'e and Pele's tears, and knew families who "[took] care of the resources in practicing their traditional culture" in the proposed project area. The LUC made no findings or conclusions whatsoever regarding these uses.

below, the LUC charged KD with blanket authority to "preserve and protect any gathering and access rights of native Hawaiians" without identifying those rights or providing any specificity as to the locations on which native Hawaiians could be expected to exercise them. *See infra* section III.B.4.

Moreover, none of the LUC's findings or conclusions addressed possible native Hawaiian rights or cultural resources *outside* of KD's 235–acre RMP, such as Ka Pa'akai's members' use of the mauka-makai trails to reach salt-gathering areas, the religious significance of the 1800–1801 lava flow, or the gathering of Pele's Tears. At the hearing, Hannah Springer testified that she and her family "utilize the mauka/makai trails as well as the lateral coastline trails" to reach the coastline, where they gather salt. She averred that "[t]hese trails are important to us to substantiate the continuity with the ancestors .... [and that she and her family] have a sincere appreciation for having the opportunity to literally walk the trails of the ancestors."[30] She also asserted that she, as part of Pua Kanahele's hula halau, gathered both kūpe'e and Pele's Tears within the petition area.[31] The LUC did not articulate whether the area lying outside of the RMP *lacked* cultural resources or that the resources present *lacked significance* warranting protection or management. These omissions are of particular significance because these activities fall outside the "protection" of KD's conceptual RMP area.

Equally important, the LUC made no specific findings or conclusions regarding the *effects on* or the *impairment of* any Article XII, section 7 uses, or the *feasibility of the protection* of those uses. Instead, as mentioned, the LUC delegated unqualified authority to KD, by way of Condition No. 18, to

assess what methods, if any, to employ to protect native Hawaiian rights. At the hearing, Springer testified that, "[b]ecause of the quality of the salt for which Kalaemanō is renowned is based upon the water quality, it becomes a water quality issue. If indeed a great amount of topsoil is imported and dry wells are utilized to accommodate runoff, we might assume that the quality of the waters off of Kalaeman[ō] may be subject to ... degradation ... and that would certainly have a detrimental impact upon the salt."[32] She further averred that, "particularly because members of our family and through [sic] our family friends utilize [the salt] for religious purposes, and because of the high quality with regard to cleanliness of that salt, anything that would tarnish or degrade the quality of that salt would degrade the quality of our religious practice."

Moreover, Leimana Damate, of KHCC, testified that "[t]he area in question, if developed, will adversely affect the gathering activities and impact the access rights of Hawaiians, particularly in the area known as Kalaeman[ō]...." She further asserted that "[t]he area of Kalaeman[ō] was a source of gathering for the whole area of Kekaha and continues to be used by Hawaiians today. The development will compromise these gathering practices significantly." Finally, she submitted that she and others "embrace the practice of using the ahupua'a as a model for integrated planning. This planning includes the protection and conservation of all waters and other resources, embracing the ahupua'a custom and tradition from the mountains to the sea, including forest reserves, streams, anchialine ponds and coastal waters. This practice ... would be curtailed by the Ka'upulehu Development." *See also*

---

30. Springer also testified that "[w]e have particular examples with reference to this project as described being a part of Kalaeman[ō], it is known that people from Mahai'ula, from Makalawena, from Kukio would travel down the coastline from their home ahupua'a to Kalaeman[ō] to gather salt."

31. Pua Kanahele likewise testified to the gathering of kūpe'e.

32. Springer further testified that "in particular, if we are going to gather, say, salt, say, to give to

the teachers who will be using it for ceremonial purposes, ease of access is not necessarily critical to the performance of the practice. What is critical to the performance of the practice is that the body, and thus the spirit, becomes imbued with the character of the land; that by moving at a pace other than the pace of our workaday world, we are allowed to experience and be imbued with the characteristics of the land, the quiet, as well as what we see on our walk, all of which is setting the tone for the gathering that might occur."

Section III.A. (describing group members' testimony as to various cultural resources within the petition area). In rendering its findings and conclusions, the LUC failed to assess any of this potentially relevant testimony regarding possible effects on or impairment of Ka Pa'akai's members' traditional and customary practices.[33]

If the practice of native Hawaiian rights being exercised will be curtailed to some extent by the land use reclassification and the resulting development, the LUC is obligated to address this. Indeed, the promise of preserving and protecting customary and traditional rights would be illusory absent findings on the extent of their exercise, their impairment, and the feasibility of their protection. Requiring these minimal prerequisites facilitates precisely what the 1978 Constitutional Convention delegates sought: "badly needed judicial guidance" and the "enforcement by the courts of these rights[.]" *See* Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 640. *See also Pele Defense Fund*, 73 Haw. at 619–20, 837 P.2d at 1271 ("[I]n reaffirming these rights in the Constitution, your Committee feels that badly needed judicial guidance is provided and enforcement by the courts of these rights is guaranteed.") (Quoting Stand. Comm. Rep. No. 57, in 1 Proceedings of the Constitutional Convention of Hawai'i of 1978, at 640.)

### 4. *The LUC improperly delegated its duty to KD.*

 KD argues, however, that Hawaiian rights are adequately protected because the LUC's Condition No. 18 requires KD to "preserve and protect any gathering and access rights of native Hawaiians who have customarily and traditionally exercised subsistence, cultural and religious practices on the subject property." KD further maintains that its conceptual RMP will adequately protect any such rights. This wholesale delegation of responsibility for the preservation and protection of native Hawaiian rights to KD, a private entity, however, was improper and

misses the point. These issues must be addressed *before* the land is reclassified.

In *Hui Alaloa*, this court held that, contrary to statutory mandates, the Maui Planning Commission impermissibly delegated its authority to determine whether a development complied with the policies and objectives of the CZMA to the applicants for a special management area permit. In that case, following testimony on behalf of all the parties, the planning commission granted permits to two developers "conditioned upon retention of a qualified archaeologist to conduct a further survey and excavation of the area, and to 'prepare a written report to maximize information retention through preservation or salvage of significant archaeological sites and to provide a plan for protecting, restoring, interpreting, and displaying historical resources either preserved on or salvaged from the subject areas.'" *Id.* at 137, 705 P.2d at 1044. The planning commission also directed one petitioner's archaeologist to determine the significance of various archaeological sites, and required both petitioners to "eliminate all grading or construction impact on any significant archaeological sites prior to salvage and preservation." *Id.*

On appeal, this court first identified the CZMA's objectives and policies of "identify[ing] and analyz[ing] significant archaeological resources; maximiz[ing] information retention through preservation of remains and artifacts or salvage operations; and support[ing] State goals for protection, restoration, interpretation, and display of historic resources." *Id.* at 135, 705 P.2d at 1043 (citing HRS § 205A–2(c)(2)(A)–(C) (brackets added)). We emphasized that a specific finding—that the developments are consistent with the CZMA's objectives of protecting and preserving historic and pre-historic resources—must *first* be made before a SMA permit can be issued. *Id.* (citing *Mahuiki*, 65 Haw. 506, 654 P.2d 874). We therefore concluded that "[t]he determination whether the development complies with the policies and objectives of the CZMA regarding his-

---

**33.** Aside from a finding on scientifically-identified archeological sites in the petition area, *see* FOF No. 78, the LUC's findings are, at best, ambivalent as to what the potential impact on valued cultural resources might be.

torical and archaeological significance was, in essence, left to the applicants contrary to the statutory command governing the issuance of SMA permits." *Id. See also Idaho v. Interstate Commerce Comm'n,* 35 F.3d 585, 596 (D.C.Cir.1994) (agency impermissibly abdicated its regulatory responsibility where it allowed a private licensee, alone, to assess the total environmental impact of its activities); *Sierra Club v. Sigler,* 695 F.2d 957, 962 n. 3 (5th Cir.1983) ("[A]n agency may not delegate its public duties to private entities[.]") (Citing *Sierra Club v. Lynn,* 502 F.2d 43, 59 (5th Cir.1974)), *rehearing denied,* 704 F.2d 1251 (5th Cir.1983); *Illinois Commerce Comm'n v. I.C.C.,* 848 F.2d 1246, 1258 (D.C.Cir.1988) (The Interstate Commerce Commission "may not delegate to parties and intervenors its own responsibility to independently investigate and assess the environmental impact of the proposal before it.") (Citations omitted.), *certiorari denied,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989).

Here, as in *Hui Alaloa,* the delegation of the protection and preservation of native Hawaiian practices to KD under KD's RMP was inappropriate. As noted above, the LUC found that KD "will develop and implement" its RMP, which *"would in the future"* coordinate development with native Hawaiian rights to coastal access for the purpose of traditional cultural practice.[34] The LUC's verbatim adoption of KD's *conceptual* RMP and KS/BE's *future* study, without any analysis of the project's impact, violates the LUC's duty to independently assess the impacts of the proposed reclassification on such customary and traditional practices.[35] Moreover, such balancing of the developer's interests with the needs of native Hawaiians should have been performed, in the first instance, by the LUC.

Second, as indicated, the LUC granted the boundary reclassification conditioned upon KD preserving and protecting *"any* gathering and access rights of native Hawaiians who have customarily and traditionally exercised subsistence, cultural and religious practices on the subject property." Pursuant to our decision in *PASH,* the petitioner's obligation to allow access for traditional and customary practices continues to the extent that these practices can reasonably co-exist with the development of the property. 79 Hawai'i at 451, 903 P.2d at 1272. In the instant case, the boilerplate language in Condition No. 18 confers upon KD the unfettered authority to decide which native Hawaiian practices are at issue and how they are to be preserved or protected. Moreover, Condition No. 18 addresses only such native Hawaiian rights as are left enforceable *after* the development is complete, at some undeter-

---

34. Leimana Damate, of KHCC, expressed concern that, although KHCC and other native Hawaiian groups were informed of the proposed project early on, KHCC was "concerned ... to find out that the permitting process would be initiated a mere three months after we were approached. At this time there is no formal guarantee either in the environmental impact statement, in writing from the landowner, or any written document from the developer stating that the Kona Hawaiian Civic Club will be a part of any such plan."

Moreover, as the testimony at the contested case hearings reveals, only a draft of KS/BE's ahupua'a plan was available at the time the LUC made its decision. The testimony of Robert Lindsay, representative of KS/BE, further illustrates the conditional and uncertain nature of the conceptual plans:

[Lindsay]: If I may respond this way to your, Mr. Powell, I think that Ka'upulehu as—or Ka'upulehu as an ahupua'a is a very very big place and, you know, I've talked with our lessee along the way about opportunities

maybe where an Hawaiian place could be created within that ahupua'a *at some point in time, perhaps not in this area but in another place within the ahupua'a.*

Q: Are there any other areas along the shoreline in the ahupua'a, assuming this project is approved, are there any other areas in the Ka'upulehu ahupua'a along the shoreline that will not be developed?

[Lindsay]: We're looking at the salt area, Kalaeman[ō], as an area that is to remain the way it is and possibly as an area which could be— right now it's described as a recreation area. My thought is that it should be described as a pu'uhonua, a special refuge place for our people to come to practice the traditions that relate to salt gathering or other practices or traditions that could be appropriate for this place.

35. It is also important to note that neither the boundaries of the Resource Zones contained in the RMP, nor the specific uses in each zone have been established.

mined time and under indeterminate circumstances.[36]

Specific considerations regarding the extent of customary and traditional practices and the impairment and feasible protection of those uses must first be made before a petition for a land use boundary change is granted. The power and responsibility to determine the effects on customary and traditional native Hawaiian practices and the means to protect such practices may not validly be delegated by the LUC to a private petitioner who, unlike a public body, is not subject to public accountability. Allowing a petitioner to make such after-the-fact determinations may leave practitioners of customary and traditional uses unprotected from possible arbitrary and self-serving actions on the petitioner's part. After all, once a project begins, the pre-project cultural resources and practices become a thing of the past.

With the aforementioned framework in mind, *see supra* Section III.B.2., and based on history and precedent, we hold that, insofar as the LUC allowed KD to direct the manner in which customary and traditional native Hawaiian practices would be preserved and protected by the proposed development—prior to any specific findings and conclusions by the LUC as to the effect of the proposed reclassification on such practices—the LUC failed to satisfy its statutory and constitutional obligations. In delegating its duty to protect native Hawaiian rights, the LUC delegated a non-delegable duty and thereby acted in excess of its authority. We therefore remand this case to the LUC for the limited purpose of entering specific findings of fact and conclusions of law, with further hearing if necessary, regarding: (1) the identity and scope of "valued cultural, historical, or natural resources" in the petition area, including the extent to which traditional and customary native Hawaiian rights are exercised in the petition area; (2) the extent to which those resources—including traditional and customary native Hawaiian rights—will be affected or impaired by the proposed action; and. (3) the feasible action, if any, to be taken by the LUC to reasonably protect native Hawaiian rights if they are found to exist.[37]

---

36. Equally problematic, the LUC did not establish a procedure by which native Hawaiians are able, before actual construction begins, (1) to obtain an indication from KD as to which native Hawaiian practices it considers "traditional or customary" or (2) to enforce those rights once found.

In addition, we cannot discern from the LUC's decision any requirement that KD present to the LUC for final approval KD's completed and final RMP, including any proposal for protecting traditional and customary native Hawaiian rights.

37. PTP further contends that the LUC erred in relying on KD's financial disclosure under HAR § 15–15–50(c)(8). HAR § 15–15–50(c)(8) requires that all petitions for boundary amendment by private entities and individuals provide "a clear description of the manner in which the petitioner proposes to finance the development, a statement of petitioner's current financial condition, including petitioner's latest balance sheet and income statement[.]"

From our view of the record, the LUC did not err in determining that KD had submitted the requisite evidence relating to the financing of the development. During the contested case hearing, Alex Kinzler, KD's president, testified to various alternative means of financing the initial phase (Phase I) of the proposed development. According to Kinzler's testimony, one alternative would be the formation of a joint venture with an independent developer. The other would be to obtain conventional financing, as is common practice in the development industry. Kinzler further testified that he expected that sales revenues from the initial phase to be used to finance subsequent development phases.

According to the LUC's findings, KD's managing partner's parent company filed consolidated financial statements showing its earnings, revenues, and cash flow. The LUC also entered a finding reflecting Kinzler's testimony as to the possible alternative means of financing the project. *See supra* Section I. Thus, in view of reliable, probative, and substantial evidence on the whole record, the LUC did not err in relying on KD's financial disclosure.

Ka Pa'akai submits that the LUC improperly relied on the DLNR's comments, which were based on unofficial standards and criteria. Ka Pa'akai specifically contends that the LUC improperly utilized the DLNR's October 4, 1995 comment on the petitioner's archaeological survey, the testimony of James Bell, Anne Mapes, and Paul Rosendahl, and archaeological reports, all of which were based on the DLNR's unpublished "draft" rules, because such evidence was not "reliable" or "probative." We disagree.

Ka Pa'akai has failed to demonstrate that the LUC improperly relied on the DLNR's comments based on unpublished "draft" rules. As the circuit court correctly recognized, "DLNR was merely one of a number of agencies and persons given an opportunity to comment during the LUC proceedings. HRS § 6E–42. The LUC is

## IV. CONCLUSION

The State and its agencies are obligated to protect the reasonable exercise of customarily and traditionally exercised rights of Hawaiians to the extent feasible. *PASH*, 79 Hawai'i at 450 n. 43, 903 P.2d at 1271 n. 43. As the state legislature's recent observations make clear, this protection has not been ensured, resulting in both the loss of vital cultural resources and the interference with the exercise of native Hawaiian rights.

For the reasons set forth above, we hold that: (1) the circuit court did not err in concluding that Ka Pa'akai and PTP had standing under HRS § 91–14; (2) the LUC did not err in relying on KD's financial disclosure; (3) the LUC did not err in relying on the comments of the DLNR; and (4) the circuit court did not err in failing to specifically rule on four of Ka Pa'akai's points of error on appeal. We hold, however, that the LUC's findings of fact and conclusions of law are insufficient to determine whether it fulfilled its obligation to preserve and protect customary and traditional rights of native Hawaiians. The LUC, therefore, must be deemed, as a matter of law, to have failed to satisfy its statutory and constitutional obligations.

We therefore vacate the LUC's grant of KD's petition for land use boundary reclassification and remand to the LUC for the limited purpose of entering specific findings and conclusions, with further hearing if necessary, regarding: (1) the identity and scope of "valued cultural, historical, or natural resources" in the petition area, including the extent to which traditional and customary native Hawaiian rights are exercised in the petition area; (2) the extent to which those resources—including traditional and customary native Hawaiian rights—will be affected or impaired by the proposed action; and (3) the feasible action, if any, to be taken by the LUC to reasonably protect native Hawaiian rights if they are found to exist.

not required by law to give any specific deference, weight or exclusive consideration to DLNR's comments and, in the absence of such comments, would still be able to render a decision." Thus, the LUC permissibly relied on the comments of the DLNR.

Ka Pa'akai's final contention that the circuit court failed to specifically rule on four of its points of error on appeal is without merit. Contrary to Ka Pa'akai's argument, the circuit court sufficiently set forth the bases for its affirmance of the LUC's decision. For example, the circuit court stated in its conclusions of law that "[t]here has been no showing by Appellant that the LUC abused its discretion by electing to consider the subject of 'cultural resources' by adjudication, rather than rule-making." Moreover, it concluded that, "[a]s to the issue of whether the LUC improperly considered comments from another agency, the [DLNR,] because DLNR has allegedly failed to promulgate specific rules on cultural resources pursuant to HRS Chapter 6E, the record reveals no error or impropriety." *See also supra* Section I.

Accordingly, in view of the record before us, the circuit court's findings and conclusions are sufficient to disclose to this court the steps by which it reached its ultimate conclusion.